**GUTRIDE SAFIER LLP**
ADAM J. GUTRIDE (State Bar No. 181446)
SETH A. SAFIER (State Bar No. 197427)
MARIE A. MCCRARY (State Bar No. 262670)
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 336-6545
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| PELENATITA OLOSONI, and DEREK SNARR, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HRB TAX GROUP, INC. and HRB DIGITAL LLC,<br><br>Defendants. | Case No. 3:19-cv-0361-SK<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**INTRODUCTION**

1.      Plaintiffs Pelenatita Olosoni and Derek Snarr, on behalf of themselves, the general public, and those similarly situated, ("Plaintiffs"), by and through their attorneys, bring this class action against Defendants HRB Tax Group, Inc. and HRB Digital LLC ("Defendants" or "H&R Block"), on behalf of themselves, the general public, and those similarly situated, for violations of California's Consumer Legal Remedies Act ("CLRA"), California Civil Code §§ 1750 *et seq.*; False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*; and Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17500 *et seq.* Plaintiffs allege the following upon information and belief, except for those allegations that specifically pertain to Plaintiffs, which are based on Plaintiffs' personal knowledge.

2.      Defendants market and sell the H&R Block brand of tax preparation software and services to consumers and businesses.

3.      In 2002, the Internal Revenue Service ("IRS") launched a program pursuant to which the majority of taxpayers in the United States would be able, and would be encouraged, to e-file their federal tax returns for free. To accomplish this goal, the IRS partnered with private companies to handle the e-filing services and processes. Under the program, all taxpayers with adjusted gross income below the 70th percentile (currently, below $66,000 per year) are eligible for free online filing.

4.      Through their participation in the IRS "Free File" program, Defendants are required to make available free electronic tax filing services to certain eligible taxpayers and to refrain from marketing their commercial services in competition with the Free File program. While Defendants purport to offer such a free service, available at https://www.hrblock.com/ffa/ (referred to herein as "Defendants' True Free File Service" or "H&R Block Free File"), Defendants are affirmatively acting to hide that program from taxpayers, divert taxpayers seeking free e-filing services into Defendants' paid programs, mislead taxpayers into believing that Defendants' paid programs are free, and ultimately misleading taxpayers into believing that they must pay to file their tax returns.

5.      Defendants aggressively advertise, and direct consumers to, a competing service that Defendants represent as "free," "free tax filing," and "H&R Block's free online tax filing," available at https://www.hrblock.com/online-tax-filing/free-online-tax-filing/ (Defendants' "Fake 'Free' Offer"), which is **not** the same as Defendants' True Free File Service and which is ultimately **not** free for most taxpayers. Defendants' Fake "Free" Offer is a lure Defendants use to ensnare unsuspecting taxpayers. At the same time, Defendants take steps to hide the existence of Defendants' True Free File Service, including intentionally hiding it from search engines and depressing its search rankings. This is essentially a bait-and-switch scheme: Defendants use deceptive, misleading, and unfair marketing and tactics to divert taxpayers from the true IRS Free File program into their Fake "Free" Offer (or to pages promoting it), and then Defendants tell taxpayers who are eligible for free filing under the IRS Free File program that they have to pay for Defendants' tax preparation services ("Defendants' Bait-and-Switch Program").

6.      The majority of taxpayers are eligible to file their tax returns for free and should be directed to one of the IRS Free File offers. By contrast, only a small portion of taxpayers satisfy the conditions for filing a free return within the Fake "Free" part of Defendants' Bait-and-Switch Program. Nonetheless, Defendants heavily promote their Bait-and-Switch Program, manipulate search engine results to divert taxpayers seeking free services (such as Defendants' True Free File Service) into Defendants' Bait-and-Switch Program, and then prompt many taxpayers to pay Defendants for services that those taxpayers do not need. Once Defendants lure taxpayers into Defendants' Bait-and-Switch program, Defendants falsely and misleadingly tell most of them that they must pay to file their tax returns, even though the taxpayers are actually eligible to file their returns for free through Defendants' True Free File Service or through another IRS Free File program available from another provider. Defendants' deceptive conduct of creating the Bait-and-Switch program misleads reasonable taxpayers to believe that they are ineligible for the IRS Free File program, when in fact they are eligible.

7.      Throughout the relevant period, Defendants have obtained substantial profits from their deceptive and unfair practices.

1

## **PARTIES**

2       8.    Plaintiff Pelenatita Olosoni is, and at all times alleged in this Complaint was, an

3  individual and resident of Hayward, California.

4       9.    Plaintiff Derek Snarr is, and at all times alleged in this Complaint was, an

5  individual and resident of San Francisco, California.

6      10.    Defendant HRB Tax Group, Inc. is a company existing under the laws of the State

7  of Missouri, having its principal place of business at One H&R Block Way, Kansas City,

8  Missouri 64105.

9      11.    Defendant HRB Digital LLC is a company existing under the laws of the State of

10  Delaware, having its principal place of business at One H&R Block Way, Kansas City, Missouri

11  64105.

12      12.    The Parties identified in paragraphs 10-11 of this Class Action Complaint are

13  collectively referred to hereafter as "Defendants."

14      13.    With respect to the allegations herein, each of the Defendants was each other's

15  agent and, in doing the things herein alleged, was acting within the scope and course of its

16  authority as such agent.

17      14.    With respect to the allegations herein, each of the Defendants was a member of,

18  and engaged in, a joint venture, partnership and common enterprise, and acting within the course

19  and scope of, and in pursuance of, said joint venture, partnership and common enterprise.

20      15.    With respect to the allegations herein, the acts and omissions of each of the

21  Defendants concurred and contributed to the various acts and omissions of each and all of the

22  other Defendants in proximately causing the injuries and damages as herein alleged.

23      16.    With respect to the allegations herein, each of the Defendants ratified each and

24  every act or omission complained of herein. At all times herein mentioned, each of the

25  Defendants aided and abetted the acts and omissions of each and all of the other Defendants in

26  proximately causing the damages, and other injuries, as herein alleged.

27

28

1

**JURISDICTION AND VENUE**

2    17.    Plaintiffs bring this action pursuant, *inter alia*, to the California Business and

3    Professions Code, section 17200, *et seq.* Plaintiffs and Defendants are "persons" within the

4    meaning of the California Business and Professions Code, section 17201.

5    18.    The injuries, damages and/or harm upon which this action is based, occurred or

6    arose out of, and will continue to occur and arise out of, activities engaged in by Defendants

7    within and affecting the State of California.

8    19.    Defendants aggressively market their tax preparation services in California to

9    citizens of California, have engaged in numerous transactions with California taxpayers, have

10   harmed many California taxpayers, and will continue to harm many California taxpayers, as

11   alleged herein.

12   20.    Defendants have engaged, and continues to engage, in substantial and continuous

13   business practices in the State of California, including in the County of San Francisco.

14   21.    Defendants have an Online Services Agreement associated with their online tax

15   preparation services, which includes an arbitration provision that states, in part, as follows:

16

17   11.3 **Waiver of right to bring class action and representative claims.** All arbitrations
     will proceed on an individual basis. The arbitrator is empowered to resolve the dispute
18   with the same remedies available in court, including compensatory, statutory, and punitive
     damages; attorneys' fees; and declaratory, injunctive, and equitable relief. However, any
19   relief must be individualized to you and will not affect any other client. The arbitrator is
     also empowered to resolve the dispute with the same defenses available in court, including
20   but not limited to statutes of limitation. **You and the H&R Block Parties also agree that
     each may bring claims against the other in arbitration only in your or their
21   respective individual capacities and in so doing you and the H&R Block Parties
     hereby waive the right to a trial by jury, to assert or participate in a class action
22   lawsuit or class action arbitration, to assert or participate in a private attorney
     general lawsuit or private attorney general arbitration, and to assert or participate
23   in any joint or consolidated lawsuit or joint or consolidated arbitration of any kind.**
     If a court decides that applicable law precludes enforcement of any of this paragraph's
24   limitations as to a particular claim for relief, then that claim for relief (and only that claim
     for relief) must remain in court and be severed from any arbitration. The H&R Block
25   Parties do not consent to, and the arbitrator will not have authority to conduct, any class
     action arbitration, private attorney general arbitration, or arbitration involving joint or
26   consolidated claims, under any circumstance.

27

28

22. Under *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017), Defendants' arbitration provision purports to deprive California taxpayers of their right to seek a public injunction under the CLRA, FAL, and UCL in any forum and thus is not enforceable. This action is not subject to arbitration because it seeks public injunctive and declaratory relief, under *McGill*, to prohibit Defendants from continuing their deceptive and unfair practices and to protect the general public from the threat of future injury. Moreover, Defendants' arbitration provision explicitly states that "If a court decides that applicable law precludes enforcement of any of this paragraph's limitations as to a particular claim for relief, then that claim for relief (and only that claim for relief) must remain in court and be severed from any arbitration." Under the express terms of this arbitration provision, the claims asserted in this lawsuit "must remain in court" and are not subject to the limitations of Defendants' purported arbitration agreement.

23. In addition, Plaintiff Snarr has opted out of the arbitration within 60 days, as provided by Defendants' Online Services Agreement:

> **Right to Opt Out of This Arbitration Agreement: You are not required to accept arbitration even though you must accept this Agreement to receive service today. You may opt out of this Arbitration Agreement within the first 60 days after you accept this Agreement by fully filling out the form found at www.hrblock.com/goto/optout, or by sending a signed letter to Arbitration Opt-Out, P.O. Box 32818, Kansas City, MO 64171. The letter should include your printed name, the first five digits of your Social Security Number, state, zip code, and the words "Reject Arbitration." If you opt out of this Arbitration Agreement, any prior arbitration agreement will remain in force and effect.**

24. Plaintiff Snarr filed his federal and state tax returns on April 15, 2019, and opted out of the above-referenced arbitration provision on May 14, 2019, by filling out the form found at www.hrblock.com/goto/optout.

25. In accordance with California Civil Code Section 1780(d), Plaintiffs file herewith a declaration, attached as Exhibit 1, establishing that they are filing this lawsuit in the county in which Plaintiff Snarr filed his tax return and was harmed.

26. Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

### A.    Defendants' Online Tax Services

27.    Defendants develop, market, sell, operate, and control a number of financial products and services, including electronic tax preparation and filing software, services, and applications. According to a press release, dated April 24, 2019, on Defendants' website, H&R Block products and services were used to prepare more than 20 million tax returns in the United States in Defendants' most recent fiscal year. About 2 million of those were through desktop products and about 6 million were filed online, while only 661,000 of those were part of the IRS Free File program. *See* https://www.hrblock.com/tax-center/newsroom/around-block/financial-statements/tax-season-volume-april-19-2019/ (last accessed May 14, 2019).

28.    Electronic tax preparation and filing software and services generally consist of two basic components: a user interface that prompts users to provide relevant information and an electronic tax engine which processes the information. The interface is similar to that with a live tax preparer. Through a series of questions, taxpayers provide information to the software, which is then processed by the tax engine for calculation. The tax engine is a software program based upon federal and state tax codes and regulations.

29.    Defendants offer a desktop version of their software as well as an online version and a mobile application version. Taxpayers using the online version of H&R Block tax preparation software and services create an account and fill out their tax information through a web-based or smartphone-based program or interface. Nearly all of Defendants' electronic tax preparation and filing software and services are sold to consumers and businesses for a fee. Among those marketed to the public for profit by Defendants is their Fake "Free" Offer, which is only free in limited instances and which is used by Defendants as part of their Bait-and-Switch Program to extract money from vulnerable taxpayers. Although most taxpayers (and all taxpayers with AGI of $66,000 or less in 2018) are entitled to file their returns for free, Defendants deceptively and unfairly inform those taxpayers that they are required to pay for Defendants' tax

services. (Defendants' for-profit tax preparation offerings are collectively referred to herein as "Paid HRB Tax Programs".)

**B.      IRS Free File Program**

30.      Congress passed the Restructuring and Reform Act of 1998, which set goals to have at least 80 percent of all federal tax returns filed electronically by 2007. To meet this 80 percent benchmark, the IRS developed a "Free File" program in 2001-2002, whereby, in theory, the majority of taxpayers would be entitled to e-file their federal tax returns for free.

31.      Rather than develop its own software to allow for the filing of tax returns electronically, the IRS decided to partner with established private software companies to provide free tax preparation and filings services. In 2002, Free File Alliance, LLC was formed, consisting of companies engaged in the electronic tax preparation and filing industry ("Members"), including the major electronic tax preparation companies such as Defendants. In 2010, those Members formed Free File, Inc. to take the place of Free File Alliance, LLC, but the Members and Free File, Inc. still sometimes use the name "Free File Alliance" to refer to themselves. (Free File, Inc. and its predecessor Free File Alliance, LLC are collectively referred to herein as "FFI.")

32.      Since 2002, the FFI has offered free online tax preparation and filing services under the IRS Free File program. Defendants are members of FFI and participate in the IRS Free File program.

33.      The IRS Free File program is intended to serve all taxpayers with an adjusted gross income ("AGI") equal to or less than that of 70 percent of all taxpayers for the prior year ("Eligible Taxpayers"). For the 2018 tax year, taxpayers with an AGI of $66,000 or less would qualify for the IRS Free File program. To further encourage e-filing, the IRS provides substantial incentives to taxpayers who file their returns electronically, including quicker processing and more rapid tax refunds, and threatens those who do not with a greater likelihood of an audit.

34.      The current operating agreement between FFI and the IRS to effectuate the IRS Free File program is the Eighth Memorandum of Understanding on Service Standards and Disputes Between the Internal Revenue Service and Free File, Incorporated ("Eighth MOU",

attached hereto as Exhibit 2), which became effective on October 31, 2018 and has a termination date of October 31, 2021.

35.     In exchange for FFI's participation in the IRS Free File program, the IRS has *not* independently developed its own tax return e-filing system, and that restraint has protected the business interests of the FFI members.

**C.     The IRS Free File Program Is Designed to Provide Filers With Easy, Streamlined Access to Free Tax Filing Services, But Recognizes the Potential for Unfair and Deceptive Practices by FFI Members.**

36.     As set forth in the Eighth MOU, FFI Members are to assist the IRS in increasing electronic filing of tax returns, and in particular, provide those services "to economically disadvantaged and underserved populations at no cost to either the individual user or to the public treasury." Ex. 2, Art. 2. The Free File program is intended "to serve the greater good" and "is focused on covering the taxpayers least able to afford e-filing their returns on their own." *Id.* Accordingly, FFI Members shall "[m]ake tax return preparation and filing easier and reduce the burden on individual taxpayers, particularly the economically disadvantaged and underserved populations," *Id.*, § 2.1; and "provid[e] taxpayers the option to file their tax return online without charge." *Id.*, § 2.4.

37.     FFI as a whole makes free e-filing services available to all Eligible Taxpayers, but each Member of FFI is only responsible for serving a fraction of the total population of Eligible Taxpayers. Accordingly, the Members of FFI impose various criteria on their own Free File offerings, knowing that all Eligible Taxpayers have access to at least one platform on which they can e-file their return for free. For example, Defendants offer free e-filing services to taxpayers with $66,000 or less in AGI and: (i) who are between the ages of 17 and 51; (ii) who have been on active duty in the military; or (iii) who qualify for the Earned Income Credit. Other Members serve non-military taxpayers with up to $66,000 of AGI, with different exclusions. Each FFI Member (including Defendants) knows that it can direct Eligible Taxpayers who do not qualify for that Member's IRS Free File service to other Members' websites where the Eligible

Taxpayers can e-file their returns for free using another service within the Free File program. The current list of available offers under the IRS Free File program is available at https://apps.irs.gov/app/freeFile (last accessed Apr. 30, 2019).

38.     The Eighth MOU recognizes and specifically addresses the potential for FFI Members to engage in unfair and deceptive practices, given that FFI Members have an incentive to mislead or exploit Eligible Taxpayers and to charge them for services that they do not need. For example, the Eighth MOU provides that each Member must set up their e-filing system in such a way so as to ensure taxpayers who do not qualify for that particular Member's free e-filing service can easily locate a free e-filing service for which they do qualify. Ex. 2, §§ 4.19.2(iii), 4.32.2. In the event that a taxpayer is ineligible for a Member's Free File offer, the Member should direct the taxpayer "back to the IRS Free File Landing Page as the first and most prominent alternative action so that [the taxpayer] may immediately consider other Free File offers available from the Free File Program." Ex. 2, §§ 4.19.2(iii).

39.     FFI Members are also not permitted to include "a 'value-added' button (i.e., an icon, link, or any functionality that provides a taxpayer with access to a Member's commercial products or services) on the Member's Free File Landing Page." Ex. 2, § 4.32.6. More generally, "[n]o marketing, soliciting, sales or selling activity, or electronic links to such activity are permitted in the Free File Program," with two limited exceptions. The first exception is the sale of a federal return **after** the taxpayer is notified that he or she is ineligible for the Member's Free File offer, has been directed back to the IRS Free File Landing Page to consider other Free File offers, and has nonetheless chosen "to complete and file his or her return using the Member's commercial offer." Ex. 2, § 4.32.5. The second exception is for "disclosures or sales (as applicable) related to free or paid state tax preparation offers as specifically provided for in this MOU." *Id.*

40.     Once a taxpayer has filed a return using a Member's Free File service, the Member is required to send at least one email to the taxpayer prior to the next year's tax season reminding the taxpayer of that Member's Free File offer and inviting the taxpayer to return to that Member's

Free File Landing Page. Ex. 2, § 4.32.4. Free File Members may not use that communication to market non-Free File products or services.

**D.    Defendants' Bait-and-Switch Program Is Designed to Trick Taxpayers Into Paying to E-File.**

41.    Defendants purport to offer two separate "free" services: Defendants' True Free File Service and Defendants' Bait-and-Switch Program. However, the Bait-and-Switch Program is designed to supplant Defendants' True Free File Service and then to railroad Eligible Taxpayers into purchasing Paid HRB Tax Programs.

42.    Defendants' True Free File Service is offered pursuant to their participation in the FFI and the Eighth MOU. To qualify for Defendants' True Free File Service, which provides free e-filing for both federal and state tax returns, the taxpayer must have $66,000 or less in AGI and: (i) be between the ages of 17 and 51; (ii) have been on active duty in the military; or (iii) qualify for the Earned Income Credit. The website for Defendants' True Free File Service is: https://www.hrblock.com/ffa/.

43.    Defendants' Bait-and-Switch Program, while using the word "free" extensively, is actually free for only a few taxpayers and is designed to extract money from vulnerable taxpayers through deceptive marketing. As explained in more detail below, among other things: (a) Defendants pay to broadly advertise their Bait-and-Switch Program on multiple platforms, in ways designed to deceive, mislead, and confuse consumers about the nature and cost of Defendants' tax services and to effectively supplant Defendants' True Free File Service; (b) Defendants manipulate search engine results to ensure that the vast majority of internet users searching for Defendants' True Free File Service are funneled instead into Defendants' Bait-and-Switch Program; and (c) Defendants design their websites to convince taxpayers that they are in the process of filing a free return when, in fact, they are in Defendants' Bait-and-Switch Program. In their advertising, internet search manipulations, and website designs, Defendants repeatedly and heavily emphasize the word "free," to mislead taxpayers as to the nature of the Bait-and-Switch Program.

1.    **Defendants Went to Great Lengths to Steer Taxpayers Into the Bait-and-Switch Program Instead of Their True Free File Service.**

44.    Defendants have used a variety of tactics to conceal their True Free File Service and to supplant it with their Bait-and-Switch Program.

45.    First, Defendants have paid for extensive ad campaigns on television, radio, internet, and social media platforms for Defendants' Bait-and-Switch Program.

46.    Second, Defendants purposely made it difficult to find Defendants' True Free File Service by placing a "noindex" tag on the webpage for that True Free File Service, which essentially tells search engines **not** to crawl that page. In particular, the source code for https://www.hrblock.com/ffa/ included the following line of code:

        &lt;meta name="robots" content="noindex, nofollow"&gt;

47.    As a result, the website for Defendants' True Free File Service typically would not appear near the top of internet search results, while webpages for Defendants' Bait-and-Switch Program (such as https://www.hrblock.com/online-tax-filing/free-online-tax-filing, https://www.hrblock.com/online-tax-filing, and https://www.hrblock.com/tax-center/filing/efile/free-e-file) would appear at the top of the list of results for searches consisting of terms such as "free," "file," "filing," "tax," "taxes," and/or "h&r block."

48.    ProPublica, a nonprofit news organization, recently published a series of articles exposing Defendants' and Intuit, Inc.'s unfair and deceptive practices with respect to the IRS Free File program and Defendants' Bait-and-Switch Program. One of those articles explained how Intuit, Inc. and Defendants used their source code to hide the webpage for Defendants' True Free File Service, using the code referenced in the above paragraph. *See* https://www.propublica.org/article/turbotax-deliberately-hides-its-free-file-page-from-search-engines (last accessed Apr. 30, 2019).

49.    In response to that negative press about Defendants' deceptive and unfair practices, and recognizing that their practices were, in fact, unfair and deceptive, Defendants recently changed the above-referenced line of source code to the following:

<meta name="robots" content="index,follow">

50.    Accordingly, it appears that Defendants are now allowing search engine robots to index the homepage for Defendants' True Free File Service. However, Defendants continue to engage in a number of additional unfair and deceptive practices.

51.    For example, Defendants hijack demand for their True Free File Service and redirect taxpayers into Defendants' Bait-and-Switch Program.

52.    Webpages for Defendants' Bait-and-Switch Program (such as https://www.hrblock.com/online-tax-filing/free-online-tax-filing, https://www.hrblock.com/online-tax-filing, and https://www.hrblock.com/tax-center/filing/efile/free-e-file) continue to appear at the top of the list of results for searches consisting of terms such as "free," "file," "filing," "tax," "taxes," and/or "h&r block."

53.    Defendants' Bait-and-Switch Program includes a webpage (https://www.hrblock.com/tax-center/filing/efile/free-e-file) that is designed to capture taxpayers seeking free e-filing services and which ranks highly in search results. A screenshot that page is below. That page represents that many taxpayers (but not all) can e-file for free with H&R Block through its Fake "Free" Offer, and includes links to other pages within Defendants' Bait-and-Switch Program (including https://www.hrblock.com/online-tax-filing/free-online-tax-filing, https://www.hrblock.com/online-tax-filing, and https://www.hrblock.com/filing-options-and-products.html). By advertising and designing their Fake "Free" Offer using the words "free," "free e-file," and "free online," and by causing webpages for the Fake "Free" Offer to appear prominently at the top of search results, Defendants thereby represent, imply, and cause taxpayers to believe that Defendants' Fake "Free" Offer is the free filing service taxpayers are seeking, that it will be free for them, and that it is the only free e-filing service Defendants offer. Defendants know that taxpayers have such beliefs and that taxpayers wish to file for free. Defendants also know that Defendants' Fake "Free" Offer will ultimately be free for only a small fraction of taxpayers, that taxpayers are generally unaware of Defendants' True Free File Service, and that taxpayers would prefer to file under Defendants' True Free File Service if they are eligible.

Defendants are both failing to disclose and actively concealing the existence and location of Defendants' True Free File Service. In sum, Defendants know that their marketing practices and webpages are unfair and misleading to reasonable consumers. Remarkably, *none* of the links on this page take taxpayers to Defendants' True Free File Service and, as the screenshot below shows, Defendants do not refer taxpayers to either Defendants' True Free File Service or to the IRS Free File program:

**TAX INFORMATION CENTER : FILING : EFILE**

## Free E-File Taxes – Learn How to e-File for Free

### Free e-File Tax Return

Free e-file taxes online with H&R Block. File your tax return with free e-file options online at H&R Block and let our expert online tax preparation help you file your taxes.

In many instances, it is possible to free e-file your tax return. Electronic tax filing is the process of submitting your completed tax return to the IRS through electronic means, usually over the Internet. This process is very desirable since it reduces the processing time of your return and may get a refund to you quicker. However, it is not available for everyone. Additionally, it is not always possible to find a free e file option. You may have to pay a small fee for this. H&R Block offers several **tax filing options**.

In many cases, free tax e-file services are available. For example, you may be able to use your **tax software** or **file online** to complete your taxes and then benefit from a free e-file credit provided to you by the organization. Most tax preparation companies will lump any fees associated in the electronic filing process into your fee for the service. This allows you to avoid paying an additional fee at the completion of your taxes to file them.

It is also important to remember that in order to file your taxes through an electronic method like this, you will need to first complete your tax return. The electronic filing process is only a submission process that sends your completed return to the IRS. You still need to complete your return and make sure that you get all of the deductions you qualify for included.

To make it easier for you to complete your taxes and to free e-file, work with H&R Block. Let our tax professionals help you to complete your taxes quickly and with the best level of accuracy. You can then get free e file service in many instances. This could help you to get your tax refund faster and it allows you to track your submission status. Let H&R Block help you to get the most back.

Learn more about H&R Block **tax offices** and our **free tax preparation** services.

| RELATED TOPICS | Dependents | Credits | Filing Online | ‹ › |

First Amended Complaint, Case No. 3:19-cv-0361-SK

54.     On certain pages within the Bait-and-Switch Program (such as https://www.hrblock.com/online-tax-filing/ and https://www.hrblock.com/filing-options-and-products.html), Defendants present four online options to the taxpayer, but none of them is the True Free File Service. The first option is the Fake "Free" Offer that is designed to lure taxpayers into Defendants' Bait-and-Switch Program. Screenshots from the two webpages referenced in the first sentence of this paragraph are, respectively, below:



55.     The landing page for Defendants' Fake "Free" Offer (https://www.hrblock.com/online-tax-filing/free-online-tax-filing), whether reached through clicking on an internet search result or on a link or icon on another webpage within Defendants' Bait-and-Switch Program, represents that Defendants' tax preparation services are "free" without referring taxpayers to either Defendants' True Free File Service or to the IRS Free File program, as a screenshot of that landing page shows below:





56.     Even if consumers enter information establishing that they are eligible for completely free filing under Defendants' True Free File Service and/or other IRS Free File programs, Defendants manipulate them into paying for tax products, services, and/or "upgrades."

57.     If, at any point, the taxpayer is informed that he or she does not qualify for the Fake "Free" Offer (whether at the end of filling out information or, occasionally, sooner) the taxpayer is presented with Defendants' Paid HRB Tax Programs and must choose a paid option to continue. The taxpayer is not directed to Defendants' True Free File Service or to the landing page for the IRS Free File program, where eligible taxpayers would be able to truly file for free and would not be told that they have to pay for Defendants' services. Thus, Defendants have structured their website to convince most taxpayers to believe that they are not eligible for free filing when they are in fact eligible for free filing.

58.     During peak filing season, Defendants purchase search advertising (in addition to other advertising) to promote its Bait-and-Switch Program to consumers seeking free filing services. For example, in the screenshot below, the second Google search result for "irs free file taxes" was a paid advertisement from Defendants directing taxpayers to "H&R Block Official Site| Free Federal Tax Filing | HRBlock.com":



- 17 -

59.     The phrases "Free Federal Tax Filing," "Prepare And File Your Federal Tax Return For Free," and "No Surprises Or Hidden Fees," all represent, imply, and cause reasonable taxpayers to believe that the "free" tax service being advertised (which is the Fake "Free" Offer) is broadly available to all or most taxpayers and that it is the only free e-filing service Defendants offer.

60.     Visitors to Defendants' homepage (www.hrblock.com) are first and most prominently presented with a choice between two buttons (or links): one for visiting an H&R Block office and one for e-filing online. The online option links to https://www.hrblock.com/online-tax-filing. That webpage (see paragraph 54 above) does not refer taxpayers to Defendants' True Free File Service or the IRS Free File program. At the bottom of the page, in small font, there is also a link titled "Free E-File" which links to https://www.hrblock.com/tax-center/filing/efile/free-e-file. That webpage (see paragraph 55 above) does not refer taxpayers to Defendants' True Free File Service or the IRS Free File program. Thus, while Defendants' homepage provides an entry point into the Bait-and-Switch Program, it does not refer to or link to Defendants' True Free File Service or the IRS Free File program.

61.     Defendants takes other affirmative acts to channel taxpayers into their Bait-and-Switch Program, to heighten the visibility of their Bait-and-Switch Program, and to suppress the IRS Free File program.

62.     For example, H&R Block explicitly instructs its customer service staff to push people away from its free offering. In written internal guidance regarding the Free File program, H&R Block instructs its employees as follows: "Do not send clients to this Web site unless they are specifically calling about the Free File program. We want to send users to our paid products before the free product, if at all possible." *See* Justin Elliott & Paul Kiel, *TurboTax and H&R Block Saw Free Tax Filing as a Threat — and Gutted It*, ProPublica, https://www.propublica.org/article/intuit-turbotax-h-r-block-gutted-free-tax-filing-internal-memo (last accessed May 13, 2019).

63.     In addition, Defendants run affiliate marketing programs or campaigns for third-party publishers of blogs and other websites. Such affiliate marketing programs encourage such publishers to promote Defendants' tax services on their websites and to provide links to Defendants' webpages where consumers can sign up for Defendants' services. In exchange, the publishers earn a commission when such consumers use Defendants' services, particularly Defendants Paid HRB Products. Through such affiliate marketing programs, Defendants provide financial incentives for third-party publishers to direct consumers to Defendants' Bait-and-Switch Program.

64.     In the affiliate marketing program, the taxpayer typically takes a slight detour by clicking on an article or webpage published by the affiliate publisher. That article or webpage (perhaps in the guise of providing a review, a recommendation, or some other information) refers to H&R Block services, may actively promote H&R Block services, and provides a link to Defendants' website. The affiliate then collects a commission for transactions in which that consumer engages while on Defendants' website.

65.     Links from third-party websites to Defendants' Bait-and-Switch webpages are a key reason why Defendants' Bait-and-Switch webpages rank so highly in the list of results for search engine queries. Accordingly, Defendants' affiliate program not only pays other parties to refer customers to Defendants' Bait-and-Switch Program but it also bolsters the ranking of Defendants' Bait-and-Switch Program in search results generally. Defendants more broadly seed the internet and provides incentives for other websites to link to Defendants' Bait-and-Switch program and to Defendants' webpages to ensure that those webpages are ranked at the top of search results.

66.     By contrast, Defendants make no such efforts to encourage links to Defendants' True Free File Service. For the most part, and particularly within the Bait-and-Switch Program to which most customers are directed, Defendants do not promote or link to their True Free File Service from other webpages within Defendants' online domain. If anything, Defendants takes steps to ensure that their True Free File Service is difficult to find, thereby minimizing the

number of third-party links to that service, lowering their ranking and public awareness of that genuinely free service, and minimizing the number of taxpayers who find and use Defendants' True Free File Service.

67.     Defendants' deceptive and unfair search engine manipulations, together with their deceptive, unfair, and confusing use of "free" in connection with their Bait-and-Switch Program, also ensure that consumers will be directed to Defendants' Bait-and-Switch Program even when Defendants has not purchased certain search engine advertising. For example, on May 6, 2019, the third non-paid search result for a Google search for "free tax filing" was a link to Defendants' Fake "Free" Offer (titled "Free Online Tax Filing" and including the description: "File your taxes online for free with H&R Block Free Edition. File free taxes online with an easy-to-use tax preparation system from H&R Block."). No link to Defendants' True Free File Service appeared on the first page of Google search results.

68.     On May 6, 2019, a search for "h&r block free filing" showed that the top three results were for pages within Defendants' Bait-and-Switch Program, with broad result headings such as "Free Online Tax Filing," "Free e-File," and "File Taxes Online – Online Tax Filing Products." Defendants' True Free File Service appeared as the fourth result under the heading "Free State Tax Filing – Free File Alliance," which could confuse or mislead consumers as to whether it provided free filing for federal returns.

69.     In sum, Defendants simultaneously: make it easy and likely for a taxpayer to end up on a webpage for Defendants' Bait-and-Switch Program; make it very unlikely that a taxpayer would find Defendants' True Free File Service; make it very unlikely that a taxpayer would see or understand the difference between the Bait-and-Switch Program and the True Free File Service; and mislead many taxpayers who are eligible for free filing into believing that they are not eligible and that they should pay Defendants for tax filing services.

1

2

      **2.     Defendants Extract Extensive Information from Taxpayers Under False Pretenses and then Trick Vulnerable Tax Payers Into Purchasing Paid HRB Tax Programs.**

3

4

5

6

7

8

9

10

11

12

      70.     After arriving at Defendants' online filing options, taxpayers are prompted to create a profile (or sign in if they already have an account) and are then prompted to provide their sensitive personal and financial information. At the beginning of the process, taxpayers are informed that the filing will be free, as indicated by the screenshots in the section above. Eligible Taxpayers believe that they have begun the process of filing for free and that Defendants will not charge them if they qualify for free filing under any e-filing service offered by Defendants. Once they log in, create an account, or begin providing their information to Defendants (other than through the landing page for Defendants' True Free File Service, which the vast majority of taxpayers never see), taxpayers are **not**, at any point, informed of or directed to Defendants True Free File Service or the IRS Free File program, even if they clearly qualify for such free services.

13

14

      71.     After the taxpayer creates a profile or logs in, Defendants then present the taxpayer with more than a dozen questions about their finances and personal data.

15

16

17

18

      72.     In reality, Defendants' Fake "Free" Offer is free for only a limited number of taxpayers who have **only** W-2 income, who have not worked as independent contractors or received any other forms of income, and who are taking only very specific deductions and are not required to file other forms.

19

20

21

22

23

24

25

      73.     The majority of the individuals who begin with the Fake "Free" Offer in Defendants' Bait-and-Switch Program are informed (often **at the end of the process**) that they will, in fact, be charged for Defendants' services. Defendants inform most taxpayers that they "need" a Paid HRB Tax Product and prompt consumers to agree to Defendants' charges. Below is an example of the type of message displayed to taxpayers who do not qualify for Defendants' Fake "Free" Offer but who would still qualify for free filing under Defendants' True Free File Service:

26

27

28

- 21 -

1

2

3

4

5

6

7

8

9

10

11

12



13    74.    Clicking on the link for "More info" further misleads consumers to believe that

14  they are ineligible for free filing and must pay Defendants for their services, as the following

15  example demonstrates:

16

17

18



19

20

21

22

23

24

25

26

27    75.    Defendants know that many taxpayers who have spent the time required to enter

28  their information in the Bait-and-Switch Program are unlikely to start over somewhere else,

First Amended Complaint, Case No. 3:19-cv-0361-SK

particularly given that Defendants hide the fact that their True Free File Service (and other services within the IRS Free File program) would be truly free. Defendants also intend for reasonable Eligible Taxpayers to conclude (and Eligible Taxpayers reasonably do conclude) that they are simply ineligible for free filing because Defendants do not conspicuously inform the taxpayers that (1) Defendants' Bait-and-Switch Program is separate from Defendants' True Free File Service and the IRS Free File program, or (2) the taxpayers would be eligible for free filing through Defendants' True Free File Service or another Free File service available from another provider. As intended by Defendants, many Eligible Taxpayers ultimately pay the charge that Defendants tells them is required at the end of the Bait-and-Switch Program.

76.     Defendants do not inform taxpayers caught in Defendants' Bait-and-Switch Program that they can file tax returns for free if they qualify for Defendants' True Free File Service, or whether the taxpayers do in fact qualify for Defendants' True Free File Service. For taxpayers using Defendants' Bait-and-Switch Program but who qualify for Defendants' True Free File Service, Defendants do not offer to transfer the taxpayers' information to Defendants' True Free File Service to complete their return for free.

77.     Defendants also do not inform taxpayers caught in Defendants' Bait-and-Switch Program that they are eligible to file tax returns for free under the IRS Free File program, which requires only that the taxpayer's AGI not exceed $66,000. There are no limitations on the federal program based on self-employment income, various deductions, and other limitations of Defendants' Fake "Free" Offer.

78.     In sum, Defendants' Bait-and-Switch Program unfairly and deceptively extracts money from tax filers who are eligible for and searching for free e-filing services. Defendants' misconduct and intent to deceive is further evidenced by its inconsistency with several of the provisions and protections of the Eighth MOU. In derogation of Section 4.19.2, Defendants' Bait-and-Switch Program does not "unequivocally inform taxpayers who are ineligible for the free offer at the earliest feasible point," that they are ineligible for the free e-filing service and direct them back to the IRS Free File Landing Page. To the contrary, Defendants' Bait-and-Switch

Program requires taxpayers to answer numerous questions and provide a lot of personal and financial information before telling them whether they "need to upgrade" (i.e., pay for the service). At no point does Defendants' Bait-and-Switch Program direct taxpayers back to the IRS Free File Landing Page or inform them that they do or may qualify for a Free File offer. Instead, in violation of the CLRA, FAL, and UCL (and despite the express provisions of the Eighth MOU, such as Sections 4.32.5 and 4.32.6), Defendants uses their Bait-and-Switch Program to direct taxpayers to Defendants' paid commercial services and products.

79.     As a result, many taxpayers, including many in precarious financial situations, were tricked into paying fees to Defendants when they should have been directed to free filing options.

80.     Defendants know that if they informed taxpayers who do not qualify for free filing in Defendants' Bait-and-Switch Program about Defendants' True Free File Service and about the IRS Free File program, and transferred the financial information they had already entered into Defendants' True Free File Service and/or directed them to the IRS Free File landing page, those taxpayers likely would not purchase any of Defendants' commercial offerings. Thus, Defendants have devised a complicated scheme to mislead and unfairly exploit taxpayers seeking free tax filing services.

81.     Defendants' efforts (and the efforts of others) to steer taxpayers away from the free filing taxpayers are seeking, and to which they are entitled, have worked. During the 2017 tax season, 2,231,261 taxpayers, less than **three percent** of Eligible Taxpayers, used Free File, a significant decrease from 2005, a year in which 5,142,125 taxpayers filed through Free File. *See* Internal Revenue Service Advisory Council Public Report (Nov. 2018), at 16, available at https://www.irs.gov/pub/irs-pdf/p5316.pdf.

### E.     Plaintiff Olosoni's Experiences

82.     Plaintiff Olosoni's AGI for 2018 was less than $66,000, so she was an Eligible Taxpayer under the IRS Free File program, and she qualified for a free federal return e-filing under multiple offers available under the IRS Free File program including Defendants' True Free

File Service. If she had been directed to the webpage for Defendants' True Free File Service in 2019, Plaintiff Olosoni would have filed her tax return for free. If she had been directed to the IRS Free File website in 2019, Plaintiff Olosoni would have found offers from multiple providers to file her federal return for free.

83.     Plaintiff Olosoni has been using Defendants' online products to file her taxes since about 2015. Defendants charged her fees in every year that she had filed through them despite the fact that she qualified for truly free filing under the IRS Free File program and despite Defendants' representations in advertisements on their webpages that taxpayers could file tax returns for "free" through H&R Block.

84.     Throughout this period, Plaintiff Olosoni saw television advertisements, heard radio advertisements, and viewed representations on Defendants' website that taxpayers could file tax returns for "free" through H&R Block.

85.     At one point, Plaintiff Olosoni called Defendants to determine why she had been charged despite Defendants' representations that tax filing would be "free" and despite her belief that she was entitled to file her returns for free. That inquiry was never substantively answered.

86.     In or about January 2019, Plaintiff Olosoni directly logged in to Defendants' website.  When she logged in to her account, Defendants routed Plaintiff Olosoni to their Bait-and-Switch Program rather than Defendants' True Free File Service. Defendants never informed Plaintiff Olosoni that she was not accessing Defendants' True Free File Service or that Defendants' had established a Bait-and-Switch Program to supplant the IRS Free File program. Defendants concealed the fact that their Bait-and-Switch Program was separate from (and designed to compete with and undermine) Defendants' True Free File Service.

87.     Based on her belief that she was eligible to file for free under generally available programs (such as the IRS Free File program), Defendants' representations in their television and radio advertisements, and the representations on Defendants' webpages within their Bait-and-Switch Program, Plaintiff Olosoni believed she qualified for a free tax return and that she could

file a free tax return through Defendants' website. Plaintiff Olosoni spent approximately 45 minutes entering in her sensitive personal and financial information, in reliance on that belief.

88.     At the end of that process, she was informed that she was not eligible to file her tax return for free and that she would be charged fees (about $85) for her state and federal filings. She was given the option to either pay upfront or have the fees deducted from her refund. She opted to have the fees deducted from her refund, in reliance on Defendants' representation that she did not qualify to file her tax return for free.

89.     Plaintiff Olosoni would not have paid for Defendants' service if she had been informed by Defendants at the outset of the process that she was eligible for Defendants' True Free File Service (as well as free tax filing from other tax service providers) and that the service to which she had been directed was not part of that True Free File Service and/or if she had been directed to the websites for those truly free e-filing services.

90.     Plaintiff Olosoni will continue to seek free tax filing services in the future and expects to continue to be eligible for such services as mandated by the IRS.  Because Defendants (a) disguise their Bait-and-Switch Program as being a true Free File program, (b) use deceptive and confusing terms to describe and market those services and can easily change the name of their True Free File Service and/or their competing Bait-and-Switch Program, (c) can change the conditions of and/or landing page for their True Free File Service, and (d) can deploy search engine optimization strategies to divert taxpayers away from Defendants' True Free File Service and the IRS Free File program and into alternative, competing services, Plaintiff Olosoni is likely to again be misled into spending time to complete tax forms through Defendants, including providing her sensitive financial information, and paying for her tax filings, unless the injunctive relief requested in this Complaint is awarded.

### F.     Plaintiff Snarr's Experiences

91.     Plaintiff Snarr's AGI for 2018 was less than $66,000, so he was an Eligible Taxpayer under the IRS Free File program, and he qualified for a free federal return e-filing under multiple offers available under the IRS Free File program including Defendants' True Free File

Service. If he had been directed to the webpage for Defendants' True Free File Service in 2019, Plaintiff Snarr would have filed his tax return for free. If he had been directed to the IRS Free File website in 2019, Plaintiff Snarr would have found offers from multiple providers to file his federal return for free.

92.      Plaintiff Snarr conducted a Google search for the words "free tax filing" (or a substantially similar combination of words) on or about April 15th, 2019. Defendants' website was one of the top results.

93.      Through that search result and its associated link, Defendants routed Plaintiff Snarr to their Bait-and-Switch Program rather than Defendants' True Free File Service. Defendants never informed Plaintiff Snarr that he was not accessing Defendants' True Free File Service or that Defendants' had established a Bait-and-Switch Program to supplant the IRS Free File program. Defendants concealed the fact that their Bait-and-Switch Program was separate from (and designed to compete with and undermine) Defendants' True Free File Service.

94.      Plaintiff Snarr spent multiple hours entering his tax information on or about April 15, 2019, believing that he was eligible to file his tax return for free and that the tax preparation and filing service offered by Defendants would be free. But, at the end of H&R Block's online process for providing information for tax filing (part of Defendants' Bait-and-Switch Program), Plaintiff Snarr was informed that he did not qualify for the Fake "Free" Offer that Defendants' had advertised and to which Defendants had directed him, and was informed that he needed to pay fees to file his tax return with H&R Block.

95.      Plaintiff Snarr was surprised by the fee disclosure because it was contrary to his belief that he was entitled to file for free and it was contrary to what Defendants had represented in their Google search result and on their website. Plaintiff Snarr opted to proceed, despite the fees (which were charged to him), in reliance on Defendants' representation that he did not qualify to file his tax return for free.

96.      Plaintiff Snarr would not have paid for Defendants' service if he had been informed by Defendants at the outset of the process that he was eligible for Defendants' True

Free File Service (as well as free tax filing from other tax service providers) and that the service to which he had been directed was not part of that True Free File Service and/or if he had been directed to the websites for those truly free e-filing services.

97.     Plaintiff Snarr will continue to seek free tax filing services in the future and expects to continue to be eligible for such services as mandated by the IRS.  Because Defendants (a) disguise their Bait-and-Switch Program as being a true Free File program, (b) use deceptive and confusing terms to describe and market those services and can easily change the name of their True Free File Service and/or their competing Bait-and-Switch Program, (c) can change the conditions of and/or landing page for their True Free File Service, and (d) can deploy search engine optimization strategies and tactics to divert taxpayers away from Defendants' True Free File Service and the IRS Free File program and into alternative, competing services, Plaintiff Snarr is likely to again be misled into spending time to complete tax forms through Defendants, including providing his sensitive financial information, and paying for his tax filings, unless the injunctive relief requested in this Complaint is awarded.

### G.     Because Defendants Intend to Continue Their Deceptive and Unfair Conduct, a Public Injunction Is Needed to Protect the Public from Future Harm.

98.     While Defendants' Bait-and-Switch Program has been exposed in multiple articles, Defendants have not ended the Bait-and-Switch Program, and thus Defendants clearly intend to continue extracting money from taxpayers who are entitled to file returns for free and who should be directed to Defendants' True Free File Service or to the IRS Free File program's website.

99.     Among other things, Defendants intend to continue (1) operating and aggressively marketing their Bait-and-Switch Program, including through television, radio, social media, banner advertising, paid search advertising, affiliate marketing programs, and search engine optimization programs, (2) hiding the availability of Defendants' True Free File Service by preventing search engines from indexing key pages and content of those webpages, by excluding Defendants' True Free File Service from affiliate marketing programs, and by otherwise

depressing search engine rankings, (3) using the deceptive word "free" for their Bait-and-Switch Program, and targeting their marketing (affiliate marketing and otherwise) for Defendants' Bait-and-Switch Program to capture people searching for "free" tax filing services, in order to confuse their Bait-and-Switch Program with truly free services and to mislead taxpayers because Defendants' Bait-and-Switch Program is not actually free for most taxpayers, (4) failing to provide a clear and prominent disclosure that the "free" portion of Defendants' Bait-and-Switch Program is not Defendants' True Free File Service and failing to clearly identify the differences between the programs, (5) failing to clearly inform taxpayers of their eligibility for Defendants' True Free File Service, (6) failing to inform users at the earliest opportunity of their ineligibility for free filing under the Bait-and-Switch Program and to direct them to other truly free filing services, (7) prompting users for payment and selling paid services without clearly informing those users of their right to and eligibility for the free tax services those users sought, (8) failing to clearly and accurately inform taxpayers that any information they have provided to Defendants will automatically and conveniently be transferred to Defendants' True Free File Service if the taxpayer elects to proceed with Defendants' True Free File Service and then immediately transferring all relevant information a taxpayer has provided to Defendants to Defendants' True Free File Service if the taxpayer elects to proceed with Defendants' True Free File Service, and (9) unfairly competing with, undermining, and supplanting both Defendants' True Free File Service and the IRS Free File program generally.

100.    Defendants profit from the public's lack of awareness of or confusion about the various IRS Free File offers, from Defendants' efforts to minimize public awareness of Defendants' True Free File Service, and from the victims of Defendants' Bait-and-Switch Program.

101.    To protect these illicit and inequitable profits and to maintain space in which to conduct their deceptive and unfair practices with respect to taxpayers who are entitled to free tax preparation services, Defendants have spent millions of dollars lobbying to make sure that the IRS is legally prohibited from offering their own tax preparation and filing service, which would

make tax filing easy and free for most taxpayers and thereby substantially reduce Defendants' profits from their Paid HRB Tax Programs.[1]

102.    Defendants' investment of money in such lobbying efforts shows a determination to minimize the number of people who actually file tax returns for free, an intent to continue to profit from taxpayers who should be filing for free, and thus an intent to undermine the IRS Free File program.

103.    Moreover, Defendants' practices are poised to become worse, not better, in the future. Because the IRS is allowed under current law to develop their own e-filing system, Defendants have at least some incentive to moderate their behavior. In theory, if Defendants' conduct were to go too far and there were too many complaints, the IRS could enter the market and eliminate much of Defendants' profits. At the same time, Defendants' incentive is to try to do the bare minimum to avoid such a result, without sacrificing too much of the profits it currently earns through the Bait-and-Switch Program. By offering fig-leaf solutions to their much larger problems, Defendants are attempting to convince the IRS that it does not need to develop their own system. More significantly at this point, Defendants are attempting to ensure the passage of the legislation that is on track to prohibit the IRS from developing their own generally available, easy-to-use, cost-free e-filing system (*see* footnote 1 herein). Once that law gets passed, and the IRS is prohibited from developing an e-filing system, Defendants will no longer face any deterrence at all from the threat of IRS competition.

104.    To protect the general public from the threat of future injury, Plaintiffs seek a public injunction, under *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017), prohibiting Defendants from continuing their deceptive and unfair practices.

105.    To stop Defendants' deceptive, unfair, and unlawful conduct, Defendants should be prohibited from marketing and operating a supposedly "free" online tax return service

---

[1] *See, e.g.*, https://www.propublica.org/article/congress-is-about-to-ban-the-government-from-offering-free-online-tax-filing-thank-turbotax (last accessed April 23, 2019), https://www.propublica.org/article/filing-taxes-could-be-free-simple-hr-block-intuit-lobbying-against-it (last accessed May 13, 2019), and https://sunlightfoundation.com/2013/04/15/tax-preparers-lobby-heavily-against-simple-filing/ (last accessed May 13, 2019).

independently of and/or in competition with Defendants' True Free File Service (including Defendants' Fake "Free" Offer or any future version/variation thereof) (collectively referred to as "Competing 'Free' Service"). The only "free" e-filing service Defendants should be allowed to offer to the public is Defendants' True Free File Service. If Defendants wish to offer free filing to additional taxpayers beyond those eligible for their True Free File Service, they can simply expand the eligibility for their True Free File Service; there is no need to offer a competing "free" service.  Defendants should be prohibited from using the word "free" in connection with services other than Defendants' True Free File Service. Defendants should be prohibited from advertising any Competing "Free" Service as "free" and from purchasing search advertisements, other than advertisements for Defendants' True Free File Service, in connection with the search term "free."

106.    In the event Defendants are allowed to continue to offer a Competing "Free" Service, then through a prominent disclosure on the home page of any Competing "Free" Service, on other webpages or screens throughout the process of using such service, and on any page that indicates that a taxpayer does not qualify for such Competing "Free" Service or proposes an upgrade or payment for Defendants' Paid HRB Tax Programs, Defendants should be required to: (a) provide a clear and prominent disclosure that Defendants' Competing "Free" Service is not Defendants' True Free File Service; (b) clearly identify the differences between Defendants' True Free File Service and Defendants' Competing "Free" Service; (c) provide a prominent link to Defendants' True Free File Service; (d) unequivocally inform taxpayers at the earliest feasible point—including on the landing page for Defendants' Competing "Free" Service and/or as soon as the taxpayer enters any response (such as the taxpayer's AGI) that is sufficient to determine the taxpayer's eligibility for the following services—whether they are eligible or ineligible for Defendants' True Free File Service and whether they are eligible or ineligible for Defendants' Competing "Free" Service; (e) clearly and accurately inform taxpayers that any information they have provided to Defendants and that would be used for Competing "Free" Service or for any Paid HRB Tax Program will automatically and conveniently be transferred to Defendants' True Free File Service if the taxpayer elects to proceed with Defendants' True Free File Service; and

(f) immediately transfer all relevant information a taxpayer has provided to Defendants to Defendants' True Free File Service if the taxpayer elects to proceed with Defendants' True Free File Service.

107.    In addition, Defendants should be prohibited from engaging in unfair, deceptive, or unlawful marketing practices representing, implying, or causing (through acts or omissions) the general public to believe that any Competing "Free" Service offered by Defendants is free for all tax filers when it is not, or free for most tax filers when the service is in fact limited to a minority of taxpayers. Defendants should also be prohibited from engaging in unfair, deceptive, or unlawful marketing practices representing, implying, or causing (through acts or omissions) the general public to believe that any Competing "Free" Service offered by Defendants is the only free e-filing service offered by Defendants, if the service is *not* in fact the only free e-filing service Defendants offer.

108.    In addition, Defendants should be prohibited from engaging in practices designed to lower the prominence and ranking of Defendants' True Free File Service in search results. In particular, Defendants should be prohibited from interfering with any search engine robot crawling or indexing that would tend to increase the ranking of the webpages for Defendants' True Free File Service. And Defendants should be prohibited from using search advertisements and search engine optimization techniques to promote the ranking of any Competing "Free" Service or Bait-and-Switch Program to the prejudice of Defendants' True Free File Service. Defendants should also be prohibited from initiating, directing, or using any affiliate marketing program as part of a Bait-and-Switch Program or that refers taxpayers to a Bait-and-Switch Program, including any affiliate marketing program that targets search terms involving "free" filing or "free" tax returns and then paying affiliates when those individuals seeking "free" services are ultimately referred to and/or charged for Defendants' Paid HRB Tax Programs.

109.    Absent injunctive relief, Plaintiffs and the public at large face informational uncertainty regarding Defendants' services and are likely to be misled or confused again by Defendants' practices. Defendants can easily change the name of their True Free File Service

and/or their competing Bait-and-Switch Program (and the terms Defendants uses to describe and market those services), Defendants can also change the conditions of and/or landing page for their True Free File Service or any Competing "Free" Service, and Defendants can deploy search engine optimization strategies to divert taxpayers away from Defendants' True Free File Service and the IRS Free File program and toward a Competing "Free" Service, such that Plaintiffs and other members of the public will not be sure (a) whether they are actually proceeding with Defendants' True Free File Service or some other service, (b) whether Defendants provide more than one free service and which one they are in, and/or (c) whether they are actually eligible for Defendants' True Free File Service or some other service. Absent injunctive relief, Plaintiffs either (a) will forgo using truly free services offered by Defendants, even though Plaintiffs may be eligible and would like to use such free services, because of uncertainty as to whether they will be charged at the end of the process or (b) will again attempt to use a Competing "Free" Service that ultimately pushes them into Defendants' Bait-and-Switch Program. Absent injunctive, relief, Defendants could also continue to market their Paid HRB Tax Products and manipulate consumers into paying for Defendants' unnecessary services.

## CLASS ALLEGATIONS

110.    Plaintiffs bring this action against Defendants, on behalf of themselves and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs seek to represent the following groups of similarly situated persons, defined as follows:

> All persons who, between May 17, 2015 and the present, paid to file one or more federal tax returns through Defendants' internet-based filing system even though they were eligible to file those tax returns for free through Defendants' True Free File Service, and who resided in and were citizens of California at the time of the payments (the "Class").

111.    The following persons and entities are excluded from the Class: Defendants and their officers, directors, employees, subsidiaries, and affiliates; and all judges assigned to this case and any members of their immediate families.

112.    Plaintiffs reserve the right to propose additional or alternative classes or subclasses, or to narrow the above class definition. This reservation includes but is not limited to classes or subclasses involving consumers in multiple states or involving particular issues.

113.    This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

114.    The proposed Class is so numerous that joinder of all members is impracticable. The precise number of members in the Class is not yet known to Plaintiffs, but it is well in excess of 1,000 people.

115.    Common Questions Predominate:  This action involves common questions of law and fact to the Class because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led consumers into Defendants' Bait-and-Switch Program. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. There are questions of law and fact that are common to the Class, including, but not limited to, the following:

- whether Defendants' Bait-and-Switch Program was a deceptive, unfair, and/or unlawful practice (or set of practices);

- whether Defendants misled class members by representing that their Fake "Free" Offer was actually free;

- whether Defendants deceptively, unfairly, and/or unlawfully diverted Eligible Taxpayers from truly free filing offers into Defendants' paid products and services;

- whether Defendants breached their obligations to the class;

- whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

- the amount of revenues and profits Defendants received and/or the amount of monies or other obligations lost by class members as a result of such wrongdoing;

- whether class members are entitled to injunctive relief and other equitable relief and, if so, what is the nature of such relief; and

- whether class members are entitled to payment of actual, compensatory, incidental, consequential, exemplary, and/or statutory damages plus interest, and if so, what is the nature of such relief.

116.    Plaintiffs' claims against Defendants are typical of the claims of the Class because Plaintiffs and all other members of the Class were eligible for free filing through Defendants' True Free File Service but were charged for Defendants' products and services as a result of Defendants' Bait-and-Switch Program.

117.    Plaintiffs will fairly and adequately protect the interests of all class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain.  Plaintiffs also have no interests that are in conflict with, or antagonistic to, the interests of class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent them interests and that of the Class.  By prevailing on their own claims, Plaintiffs will establish Defendants' liability to all class members.  Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

118.    Superiority:  There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

119.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

### PLAINTIFFS' FIRST CAUSE OF ACTION

**(Violation of the Consumers Legal Remedies Act (the "CLRA"), California Civil Code §
1750, *et seq.*, on behalf of Plaintiffs and the Class)**

120.    Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

121.    Defendants' actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale of products to consumers.

122.    Each Plaintiff and each member of the Class is a "consumer" as that term is defined by the CLRA in California Civil Code § 1761(d).

123.    The tax services that Plaintiffs (and other similarly situated members of the Class) purchased from Defendants was a "service" within the meaning of California Civil Code § 1761(b).

124.    Defendants' acts and practices, set forth in this Complaint, led Plaintiffs, members of the Class, and other members of the general public to falsely believe that Defendants' Fake "Free" Offer provides free tax preparation and filing for most taxpayers. In truth, the Fake "Free" Offer was and is subject to several undisclosed and surprising conditions and was and is not free for most taxpayers. Accordingly, Defendants' representations and other actions causing tax filers to believe that the Fake "Free" Offer is a "free" service and that it is the free filing service taxpayers are seeking and to which they are entitled are false, misleading, and unfair.

125.    By engaging in the actions, representations and conduct set forth in this Complaint, Defendants have violated, and continue to violate, § 1770(a)(5), § 1770(a)(7), § 1770(a)(9), § 1770 (a)(10), and § 1770(a)(13) of the CLRA. In violation of California Civil Code §1770(a)(5), Defendants' acts and practices constitute improper representations that the goods and services they sell have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have (in particular, that Plaintiffs and members of the

Class could/can file for free through Defendants' Fake "Free" Offer and/or that Defendants' Fake "Free" Offer was/is the truly free filing service Plaintiffs and members of the Class were/are seeking). In violation of California Civil Code §1770(a)(7), Defendants' acts and practices constitute improper representations that the Fake "Free" Offer and Defendants' tax services were and are of a particular standard, quality, or grade (in particular, that they were/are free to Plaintiffs and members of the Class and/or that Defendants' Fake "Free" Offer was/is the truly free filing service Plaintiffs and members of the Class were/are seeking), when they are not. In violation of California Civil Code §1770(a)(9), Defendants falsely, deceptively, and unfairly markets and advertises their Fake "Free" Offer as free for most taxpayers, with the intent to direct Plaintiffs and members of the Class into paid services, such that Plaintiffs and members of the Class did/do not receive Defendants' services as advertised. In violation of California Civil Code §1770(a)(10), Defendants falsely, deceptively, and unfairly market and advertise their Fake "Free" Offer as free for most taxpayers, with the intent to not to supply reasonably expected demand for such free e-filings but instead to direct Plaintiffs and members of the Class into paid services. Finally, in violation of California Civil Code §1770(a)(13), Defendants makes false and misleading statements of fact concerning the existence of and amounts of price reductions for their tax e-filing services.

126.    Plaintiffs request that this Court enjoin Defendants from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2).  If Defendants are not restrained from engaging in these types of practices in the future, Plaintiffs, members of the Class, and the general public will continue to suffer harm.

127.    CLRA § 1782 NOTICE. On June 26, 2019, Plaintiffs provided Defendants with notice and demand that within thirty (30) days from that date, Defendants correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. (*See* Exhibit 3.) Defendants agreed to accept service of that notice and demand by email and they waived the statutory mailing requirements. (*Id.*) But Defendants failed to respond to Plaintiffs' letter or to take any of the requested actions within thirty days. Plaintiffs now seek, pursuant to

California Civil Code § 1780(a)(3), on behalf of themselves and those similarly situated members of the Class, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendants' acts and practices.

128.    Plaintiffs also request that this Court award their costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

## PLAINTIFFS' SECOND CAUSE OF ACTION

### (False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL"), on behalf of Plaintiffs and the Class)

129.    Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as if set forth herein.

130.    Beginning at an exact date unknown to Plaintiffs, but within three (3) years preceding the filing of the Complaint, Defendants made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of their Fake "Free" Offer.

131.    Defendants made (and continue to make) representations and statements (by omission and commission) that led Plaintiffs, members of the Class, and other members of the general public to believe that Defendants' Fake "Free" Offer was free for most taxpayers and that Defendants' Fake "Free" Offer was the truly free filing service Plaintiffs and members of the Class were seeking when attempting to file their returns for free.

132.    In truth, Defendants' Fake "Free" Offer is not part of the IRS Free File program, is subject to several undisclosed and surprising conditions, is not free for most taxpayers, and is part of Defendants' Bait-and-Switch Program, so Defendants' claims that that service is "free" are false and misleading.

133.    Plaintiffs, members of the Class, and members of the general public relied to their detriment on Defendants' false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth in the Substantive Allegations above.  Had Plaintiffs, members of the Class, and members of the general public been adequately informed and not intentionally deceived by Defendants, they would have acted differently by,

- 38 -

without limitation, refraining from using Defendants' Fake "Free" Offer and the Paid HRB Tax Programs.

134. Defendants' acts and omissions are likely to deceive the general public.

135. Defendants engaged in these false, misleading and deceptive advertising and marketing practices to increase their profits. Accordingly, Defendants engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

136. The aforementioned practices, which Defendants used, and continue to use, to their significant financial gain, also constitutes unlawful competition and provides an unlawful advantage over Defendants' competitors as well as injury to the general public.

137. As a direct and proximate result of such actions, Plaintiffs, the members of the Class, and other members of the general public have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

138. Plaintiffs seek, on behalf of themselves and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiffs and from the members of the Class by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon.

139. Plaintiffs seek, on behalf of themselves, the members of the Class, and the general public, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

140. Plaintiffs seek, on behalf of themselves, the members of the Class, and the general public, an injunction to prohibit Defendants from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will

1   continue to violate the laws of California, unless specifically ordered to comply with the same.

2   This expectation of future violations will require current and future taxpayers to repeatedly and

3   continuously seek legal redress in order to recover monies paid to Defendants to which they are

4   not entitled. Plaintiffs, the members of the Class, and other members of the general public have

5   no other adequate remedy at law to ensure future compliance with the California Business and

6   Professions Code alleged to have been violated herein.

7   **<u>PLAINTIFFS' THIRD CAUSE OF ACTION</u>**

8   **(Unlawful, unfair, and fraudulent trade practices violation of Business and Professions
Code § 17200, *et seq.* ("UCL") on behalf of Plaintiffs and the Class)**

9

10   141.    Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as

11   if set forth herein.

12   142.    Within four (4) years preceding the filing of this lawsuit, and at all times

13   mentioned herein, Defendants have engaged, and continue to engage, in unlawful, unfair, and

14   fraudulent trade practices in California by engaging in the unlawful, unfair, and fraudulent

15   business practices outlined in this complaint.

16   143.    In particular, Defendants have engaged, and continue to engage, in unlawful

17   practices by, without limitation, violating the following state laws: (i) the CLRA as described

18   herein; and (ii) the FAL as described herein.

19   144.    In particular, Defendants have engaged, and continue to engage, in unfair,

20   unlawful, and fraudulent practices as set forth in paragraphs 1-7 and 41-103 herein, which include

21   without limitation:

22   a.   concealing Defendants' True Free File Service from taxpayers (e.g., through

23   coding and search engine strategies, by failing to link to or discuss the True

24   Free File Service in prominent places on Defendants' webpages, by failing to

25   clearly disclose the material differences between Defendants' Fake "Free"

26   Offer and Defendants' True Free File Service while knowing that there is

27   consumer confusion and that consumers are seeking the True Free File Service,

28   and by failing to identify and link to the True Free File Service after taxpayers

provide information revealing that they are eligible for that truly free service);

and

b.  marketing and operating Defendants' Bait-and-Switch Program to extract money from taxpayers entitled to free filing (e.g., using paid advertisements directed toward consumers seeking free filing, using marketing and search engine strategies to direct Eligible Taxpayers to Defendants' Fake "Free" Offer when they should be directed to Defendants' True Free File Service, misrepresenting that Defendants' Fake "Free" Offer is free for most taxpayers, misrepresenting and causing Plaintiffs and members of the Class to believe that Defendants' Fake "Free" Offer is the free filing service Plaintiffs and members of the Class are seeking (and the only free service offered by Defendants) when attempting to file their returns for free, causing consumers to spend substantial amounts of time and effort inputting their tax information (including sensitive personal and financial information) before notifying them they are not eligible for the Fake "Free" Offer, prompting Eligible Taxpayers to pay for Defendants' services and misrepresenting that Eligible Taxpayers are required to pay for services they do not actually need, and failing to use information provided by Eligible Taxpayers to direct them to and automatically begin generating tax returns through Defendants' True Free File Service).

145.   Defendants have profited and continues to profit from their unfair, deceptive, and unlawful conduct.

146.   Plaintiffs, the members of the Class, and members of the general public relied to their detriment on Defendants' unlawful, unfair, and fraudulent business practices. Had Plaintiffs, the members of the Class, and members of the general public been adequately informed and not deceived by Defendants, they would have acted differently by not paying for Defendants' Paid HRB Tax Programs, and instead they would have used one of the IRS Free File services.

147.   Defendants' acts and omissions are likely to deceive and mislead the general public.

148.   Defendants engaged in these unfair, deceptive and unlawful practices to increase their profits. Accordingly, Defendants have engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

149.   The aforementioned practices, which Defendants have used to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

150.   As a direct and proximate result of such actions, Plaintiffs, the members of the Class, and other members of the public, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.   Among other things, Plaintiffs and the Class lost the amounts they paid for Defendants' services (as a result of Defendants' Bait-and-Switch Program), when they should not have paid anything to file their tax returns.

151.   As a direct and proximate result of such actions, Defendants have enjoyed, and continue to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

152.   Plaintiffs seek, on behalf of themselves and those similarly situated members of the Class, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiffs, the members of the Class, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon.

153.   Plaintiffs seek, on behalf of themselves, the members of the Class, and the general public, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

154.    Plaintiffs seek, on behalf of themselves, the members of the Class, and the general public, an injunction to prohibit Defendants from continuing to engage in the deceptive and/or unlawful trade practices complained of herein. Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future taxpayers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which they is not entitled. Plaintiffs, the members of the Class, and members of the general public have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves, the Class, and the general public, respectfully requests that the Court enter judgment against Defendants as follows:

A.  A public injunction temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint (including without limitation paragraphs 41-81, 98-103, 124-25, 130-31, and 144), and including without limitation:

   1)  prohibiting Defendants from marketing and operating any supposedly "free" online tax return service (including Defendants' Fake "Free" Offer or any future version/variation thereof) (collectively referred to as "Competing 'Free' Service") in addition to or in competition with Defendants' True Free File Service, including prohibiting Defendants from advertising any Competing "Free" Service as "free" and from purchasing search advertisements, other than advertisements for Defendants' True Free File Service, in connection with the search term "free;"

2)  as an alternative to the public injunction described immediately above, a public injunction requiring Defendants, on the home page of any Competing "Free" Service, on other webpages or screens throughout the process of using such service, and on any page that indicates that a taxpayer does not qualify for such Competing "Free" Service or proposes an upgrade or payment for Defendants' Paid HRB Tax Programs, (a) to provide a clear and prominent disclosure that Defendants' Competing "Free" Service is not Defendants' True Free File Service; (b) to clearly identify the differences between Defendants' True Free File Service and Defendants' Competing "Free" Service; (c) to provide a prominent link to Defendants' True Free File Service; (d) to unequivocally inform taxpayers at the earliest feasible point—including on the landing page for Defendants' Competing "Free" Service and/or as soon as the taxpayer enters any response (such as the taxpayer's AGI) that is sufficient to determine the taxpayer's eligibility for the following services—whether they are eligible or ineligible for Defendants' True Free File Service and whether they are eligible or ineligible for Defendants' Competing "Free" Service; (e) to clearly and accurately inform taxpayers that any information they have provided to Defendants and that would be used for Competing "Free" Service or for any Paid HRB Tax Program will automatically and conveniently be transferred to Defendants' True Free File Service if the taxpayer elects to proceed with Defendants' True Free File Service; and (f) to immediately transfer all relevant information a taxpayer has provided to Defendants to Defendants' True Free File Service if the taxpayer elects to proceed with Defendants' True Free File Service;

3)  prohibiting Defendants from engaging in unfair, deceptive, or unlawful marketing practices representing, implying, or causing the general public to believe that any Competing "Free" Service offered by Defendants is free for all

tax filers when it is not, or free for most tax filers when the service is in fact limited to a minority of taxpayers;

4) prohibiting Defendants from engaging in unfair, deceptive, or unlawful marketing practices representing, implying, or causing the general public to believe that any Competing "Free" Service offered by Defendants is the only free e-filing service offered by Defendants, if the service is *not* in fact the only free e-filing service Defendants offer;

5) prohibiting Defendants from engaging in practices designed to lower the prominence and ranking of Defendants' True Free File Service in search engine results, including prohibiting Defendants from disallowing any search engine robot crawling and indexing that would tend to increase the ranking of the webpages for Defendants' True Free File Service, and prohibiting Defendants from using search advertisements and search engine optimization techniques to promote the ranking of any Competing "Free" Service to the prejudice of Defendants' True Free File Service;

6) prohibiting Defendants from initiating, directing, or using any affiliate marketing program as part of a Bait-and-Switch Program or that refers taxpayers to a Bait-and-Switch Program, including any affiliate marketing program that targets search terms involving "free" filing or "free" tax returns and then paying affiliates when those individuals seeking "free" services are ultimately referred to and/or charged for Defendants' Paid HRB Tax Programs;

B. Additionally:

    a. On Cause of Action Number 1 against Defendants and in favor of Plaintiffs and the other members of the Class:

        i. for compensatory damages and/or restitution of the fees paid by Plaintiffs and members of the Class to Defendants, in an amount to proven at trial;

1            ii.   for injunctive relief pursuant to California Civil Code section 1780 and

2                 as described and requested in Section A; and

3            iii.  for punitive damages, in an amount to be proven at trial;

4         b.  On Cause of Action Number 2 against Defendants and in favor of Plaintiffs

5            and the other members of the Class:

6            i.   For restitution of the fees paid by Plaintiffs and members of the Class

7                 to Defendants, in an amount to proven at trial pursuant to, without

8                 limitation, the California Business & Professions Code §§ 17200, *et*

9                 *seq.*; and 17500, *et seq.*; and

10           ii.   for declaratory and injunctive relief pursuant to, without limitation, the

11                California Business & Professions Code §§ 17200, *et seq.* and 17500 *et*

12                *seq.* and as described and requested in Section A;

13        c.  On Cause of Action Number 3 against Defendants and in favor of Plaintiffs

14           and the other members of the Class:

15           i.   For restitution of the fees paid by Plaintiffs and members of the Class

16                to Defendants, in an amount to be proven at trial, pursuant to, without

17                limitation, the California Business & Professions Code §§ 17200, *et*

18                *seq.*; and

19           ii.   for declaratory and injunctive relief pursuant to, without limitation, the

20                California Business & Professions Code §§ 17200, *et seq.* and as

21                described and requested in Section A;

22   C.  For reasonable attorneys' fees and the costs of suit incurred;

23   D.  For pre-judgment and post-judgment interest on any amounts awarded; and

24   E.  For such further relief as this Court may deem just and proper.

25

26

27

28

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury as to all issues.

Dated:  August 9, 2019                              **GUTRIDE SAFIER LLP**

_____
Marie A. McCrary (California Bar No. 262670)
100 Pine Street, Suite 1250
San Francisco, CA 94111

# Exhibit 1

## **EXHIBIT 1**

I, Derek Snarr, declare:

1.      I am a Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2.      I submit this Declaration pursuant to California Civil Code § 1780(d) and California Code of Civil Procedure section § 2015.5.

3.      On or about April 15, 2019, I used and was charged for Defendants' online tax filing service while I was located in San Francisco, California, where I resided at the time and where I continue to reside.

4.      I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed in San Francisco, California on   5/17/2019



Derek Snarr

# Exhibit 2

**EIGHTH MEMORANDUM OF UNDERSTANDING ON SERVICE STANDARDS AND
DISPUTES
Between the Internal Revenue Service and Free File, Incorporated**

This Eighth Memorandum of Understanding ("MOU") is entered into as of the date of the last signature on this document between Free File, Inc. ("FFI") and the IRS.

This MOU is a 3-year follow-on agreement entered between the parties, and that has a termination date of October 31, 2021.

**Preamble**

**WHEREAS**, FFI (then Free File Alliance LLC) and the IRS entered into a 3-year agreement which was published in the Federal Register (Vol. 67, No. 153, page 51621) on August 8, 2002, and executed on October 30, 2002, (IRS Agreement) that set forth parameters to which industry members of the Alliance would offer online tax preparation and filing services to taxpayers least able to afford e-filing tax returns at no cost to such taxpayers (Services), and pursuant to which it was agreed that the Alliance will offer the Services and the IRS will provide taxpayers with links to the Services offered by the Alliance participants through a web page, which is hosted at irs.gov with links from www.usa.gov; and

**WHEREAS**, on October 29, 2005, the Alliance and the IRS agreed to amend and extend the IRS Agreement for an additional 4 years (2005 IRS Agreement); and

**WHEREAS**, the Alliance and the IRS agreed to amend and extend the IRS Agreement for an additional 5 years from October 30, 2009, through October 30, 2014 (2009 Free On-Line Electronic Tax Filing Agreement Amendment); and

**WHEREAS**, the Alliance applied for 501(C)(3) tax-exempt organization status, and the IRS granted the FFI such status in 2012; and

**WHEREAS**, FFI and the IRS agreed to amend and extend the Agreement for one year, from April 30, 2014 to December 1, 2015, with the intention to negotiate this multi-year agreement; and

**WHEREAS**, the IRS has hosted and maintained its website in accordance with the IRS Agreement; and

**WHEREAS**, the IRS publishes annually to all FFI Members its specifications, requirements, and restrictions for a fillable form program and FFI has agreed to permit one or more Members to provide the IRS an unbranded product that meets the IRS specifications for an unbranded fillable form utility; and

**WHEREAS**, FFI Members are innovators who have introduced innovations through their commercial products that make tax preparation easier, more efficient, and less prone to human error; and

**WHEREAS**, IRS believes Free File should be a place for testing and delivering innovation to taxpayers, and there is a desire to have these product innovations provided for free in the Free File Members' software programs, FFI and IRS agree that specific, continuous, and ongoing efforts should be made to provide further innovations for the benefit of Free File taxpayers over the five-year term of this Memorandum of Understanding.

**NOW THEREFORE**, for good and valuable considerations, the parties, intending to be legally bound by this MOU, hereby agree as follows:

# ARTICLE 1
## DEFINITIONS

1.1   "Affiliate" of the Member, Executive Director, or other entity shall mean any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member, Executive Director, or other entity, as applicable. The term "control," as used in the immediately preceding sentence, shall mean with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than 50 percent of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other entity, or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

1.2   "FFI Filers" shall mean those taxpayers with an Adjusted Gross Income (AGI) equal to or less than 70 percent of all United States (U.S.) taxpayers or below for the prior year, including those least able to afford e-filing tax returns, based upon verifiable characteristics in their tax return and, as a result, who for free, online tax return preparation and filing services are offered by an individual Member.

1.3   "Bankruptcy" shall mean: (a) the filing of an application by the Member for, or its consent to, the appointment of a trustee, receiver, or custodian of its assets; (b) the entry of an order for relief with respect to the Member in proceedings under the U.S. Bankruptcy Code, as amended or superseded from time to time; (c) the making by the Member of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of the Member unless the proceedings and the Person appointed are dismissed within ninety (90) days; or (e) the failure by the Member generally to pay its debts as the debts become due within the meaning of Section 303(h)(l) of the U.S. Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of its inability to pay its debts as they become due.

1.4   "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the provisions of succeeding law.

1.5   "Coverage" shall mean the lowest 70 percent of taxpayer population calculated using AGI. The IRS uses the prior year tax return information to compute the AGI amount that equates to 70 percent of the tax return population. The number of taxpayers covered each year will be adjusted for each filing season thereafter based on taxpayer population and income changes, but the agreed upon percentage of coverage will not change.

1.6   The "IRS" shall mean the Internal Revenue Service.

1.7   "Executive Director" shall mean the Executive Director of FFI.

1.8   "Member's Free File Website" shall mean Members' websites that offer free, online tax return preparation and filing services to FFI Filers.

3

1.9    "<u>Member</u>" shall mean each company in the electronic tax preparation and filing industry who is a member in good standing with FFI

1.10    "<u>Member Free File Landing Page</u>" shall mean the first page a taxpayer sees when leaving the IRS site to the Member company's site.

1.11    "<u>New Market Entrant</u>" shall mean a Person who is not yet a Member that intends to offer Services in the upcoming tax season but has not done so for past seasons.

1.12    "<u>Person</u>" shall mean an individual, partnership, limited partnership, limited liability company, corporation, association, or any other entity.

1.13    "<u>Services</u>" Shall mean free, online tax return preparation and Filing of Federal individual income tax returns.

1.14    "<u>Software Programs</u>" shall mean the software program a Member uses to provide online tax return preparation and filing services to taxpayers.

1.15    "<u>Treasury Regulations</u>" shall, unless the context clearly indicates otherwise, mean the regulations in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

1.16    The "<u>IRS Website</u>" refers to <u>www.irs.gov</u> (or <u>IRS.gov</u>).

1.17    The "<u>IRS Free File Website</u>" shall mean the website hosted and maintained by the IRS through which the Services are offered to taxpayers.

1.18    The "<u>IRS Free File Landing Page</u>" shall mean the introductory IRS Free File splash screen or landing site within the IRS Website.

1.19    "<u>Unbranded Fillable Form Utility</u>" shall mean an unbranded software product that is forms based and provided by a FFI Member in compliance with the particular requirements, limitations, and standards applicable to that service as set forth in the IRS Free File Program Fillable Forms Utility Specifications dated December 9, 2008, and is chosen by the IRS for placement on the IRS Website.

1.20    "<u>State Free File Program</u>" shall mean those programs in states that offer free preparation and e-filing of individual tax returns based on criteria that are materially consistent with the federal Free File program, and which do not provide taxpayer-funded online software for tax preparation and e-filing. In 2014, there are 21 states and the District of Columbia participating in the State Free File Program (see

Appendix A) but this definition applies to all states meeting the above criteria in a given year, and the list of eligible states may change from year to year..

1.21 "Non-Free File States" shall mean those states that have their own taxpayer-funded online software for tax preparation and e-filing.

1.22 "Active Duty Military" shall mean those individual taxpayers currently serving full time in the armed forces, including the United States Army, Navy, Marines, Air Force, Coast Guard, and National Guard, and whose income equates to the lowest 70% of the national AGI.

## ARTICLE 2
## FFI AND IRS OBJECTIVES

Members shall work in concert with the IRS to increase electronic filing of tax returns, which includes extending the benefits of online federal tax preparation and electronic filing to economically disadvantaged and underserved populations at no cost to either the individual user or to the public treasury. Further, the IRS and FFI (previously Free File Alliance or Alliance) agree that to serve the greater good and ensure the long-term stability of FFI, the scope of this program is focused on covering the taxpayers least able to afford e-filing their returns on their own. In recognition of this commitment, the federal government has pledged to not enter the tax preparation software and e-filing services marketplace. Members shall also:

2.1 Make tax return preparation and filing easier and reduce the burden on individual taxpayers, particularly the economically disadvantaged and underserved populations;

2.2 Support the IRS's statutory goals of increased electronic filing, pursuant to the IRS Restructuring and Reform Act of 1998;

2.3 Provide greater service and access to the Services to taxpayers; and

2.4 Implement one of the proposals in the President's Fiscal Year 2003 budget, specifically to encourage further growth in electronic filing by providing taxpayers the option to file their tax return online without charge using cooperation with, and encouraging competition within, the private sector.

5

# ARTICLE 3
# TRANSPARENCY IN MANAGEMENT

To manage the program in a transparent manner, the IRS will utilize the then current AGI number which equates to the lowest 70 percent of the taxpayers to manage the program, and will not accept or post any offer by a Member which exceeds this AGI amount.  The IRS will describe this limitation on the IRS Free File website. FFI will not have a role in this IRS management process.

# ARTICLE 4
# STANDARDS OF PRACTICE

4.1     Level of Service.

    4.1.1   Each Member and New Market Entrant shall:

        (i)     Be engaged in the electronic tax preparation and filing industry;

        (ii)    Have processed a cumulative total of 2,500 online returns during previous years, or has processed 25,000 e-file returns before becoming a Member;

        (iii)   Meet a 75 percent acceptance rate for electronic returns for traditional Free File throughout the filing season, excluding business rules and any subsequent codes associated with prior year AGI and self-select pin mis-matches. The IRS will work with FFI to identify any business rule errors that are a result of new legislation and/or policy. Specific business rule errors may be excluded from the computation of a company's acceptance rate.

        (iv)    Meet any increased standard agreed to for subsequent years by the IRS and FFI

    4.1.2   Any Member who does not meet the minimum acceptance rate set out in 4.1.1 (iii) and (iv) above may be removed from the IRS Free Website.

    4.1.3   Each Member and New Market Entrant shall:

        (i)     Make its Services available to not less than 10 percent and not more than 50 percent of the individual taxpayer population, or approximately seventy million (70,000,000) taxpayers, within the Coverage, as annually adjusted through IRS analysis of the taxpayer database to determine the lower 70% of all U.S. taxpayers. Additionally, any free services offered under this MOU to Active Duty Military members who meet the requirement of earning no more than the lowest 70% of the national AGI shall be exempt from this service cap of 50% of the taxpayer population. Notwithstanding other terms in this MOU, this provision exempting eligible Active Duty Military members from the service cap shall become effective in January 2015;

6

(ii)    Offer its Services on a non-discriminatory basis;

(iii)    Be an authorized IRS e-File Provider in accordance with IRS Revenue Procedure 2005-60;

(iv)    Be in compliance with applicable Department of Treasury/IRS rules, including, but not limited to, 31 C.F.R. Part 10, IRS Revenue Procedure 2005-60, current versions of IRS Publications 1345, 1345-A and 3112, 4164, Modernized e-File (MeF) Guide for Software Developers and Transmitters, 1436 Test Package for Electronic Filers of Individual Income Tax Returns for Tax Year 2014 and IRC Section 7216;

(v)    Possess and provide appropriate documentation to the IRS and the Executive Director demonstrating they have acquired third party security and privacy certifications which are applicable for the period the company is actively listed on the IRS Free File Website;

(vi)    Have appropriate logos or seals (for both privacy and security) from acceptable and recognized third party privacy and security certification providers placed in clearly visible locations on the Member's Free File Landing Page; and

(vii)    New Market Entrants shall self-certify in writing to the Executive Director, and available upon request to the IRS, that the New Market Entrant has sufficient technical capacity to meet the Level of Service requirements as set forth in this MOU and then current FFI Operating Agreement and are commercial tax preparation software providers aside from their FFI offering.

4.1.4    Participation of Non-Profits. Non-Profit Organizations will be allowed to participate in the Free File program provided that they meet all of the requirements specified in the MOU, including, but not limited to, that their services and products cannot be paid for with Government funds.

4.2    OMITTED BY INTENTION:

4.3    Only one version of each Software Program permitted other than an unbranded fillable forms utility.

4.3.1    Only one version of a Software Program is permitted per Member, except that any Member that chooses to offer an unbranded fillable form Software Program may offer that product in addition to the Software Program that is accessible from the Member's Free File Website. This provision does not preclude a Member from using the same Software Program for access both from the Member's Free File Website and as an unbranded fillable form accessible from the IRS's website. A Member may own the copyright in a Software Program or have a valid license to use a Software Program, but a Software Program may not be used by more than one Person to obtain FFI membership.

4.3.2   Members and/or any New Market Entrant applying for membership with FFI will provide the Executive Director with information as requested by the Executive Director to permit a determination as to whether Software Programs are duplicative and/or substantially similar based upon features, functions, and/or general characteristics and would violate Section 4.3.1. The IRS or the Executive Director shall review the following list of characteristics (i) through (vii), and request any facts needed from the Member or possible New Market Entrant that will assist in this evaluation. No single characteristic below is dispositive of any determination as to whether software is identical or similar. The IRS or the Executive Director may weigh items (i), (ii) and (iii) most heavily, but can take into account any fact or factor:

(i)    The degree to which the underlying software programs are substantially identical or similar;

(ii)   Changes in the logo, color, and presentation do not transform similar software programs into different versions;

(iii)  The degree to which two software programs have a look or feel that is identical or similar;

(iv)   The relationship, if any, of the respective owners of companies; for example, the degree to which corporate officers are the same or dissimilar; whether locations of incorporation are the same or similar, whether the same Uniform Resource Locator is being used by more than one entity; the degree to which two member companies use the same third party developer, etc.;

(v)    The degree to which the company's revenue is related to FFI or principally through commercial sales of software, tax preparation services, and electronic filing to the general public;

(vi)   The degree to which each company has adequate financial resources;

(vii)  The degree to which each company has the necessary organization, experience, operational controls, and technical skills to participate in the tax software preparation industry;

(viii) The degree to which each company has the necessary technical equipment and facilities; provided that companies are permitted to sell, license, or otherwise transfer software programs for services utilized in FFI offerings, but such sale, license, or other arrangement may be reviewed for its underlying purpose and must be consistent with this entire section; or

(ix)   The degree to which the company has offered and sold tax preparation software and e-filing services competitively in substantial quantities to the general public in the commercial marketplace based on established

catalog prices. For these purposes, catalog prices shall be interpreted consistent with the current definition as described in FAR Part 2.101, or if repealed in entirety, the last version of such definition.

4.3.3    Members and/or New Market Entrants applying for membership in FFI will make the following disclosures with respect to any licensed Software Programs:

    (i)    Disclose whether another Person owns more than 25 percent of the code of the licensed Software Program. In the event another Person owns more than 25 percent of the code of the proposed Software Program, the Member and/or New Market Entrants applying for membership must additionally disclose the Person from whom the license has been obtained, as well as the business address and contact point to verify the scope of the license and the relationship between the parties.

    (ii)    Disclose whether another Person is providing the Member and/or New Market Entrant with servers or other back-end support other than telecommunications, and provide the business address and contact information for such Person.

4.3.4    All Members shall adhere to industry best practices to ensure the taxpayer return information entrusted to them is secure and the privacy of such information is maintained. In any instance where a Member company contracts with a service provider to obtain technology services, the service provider must adhere to the established industry best practices standard. To the extent multiple Members rely on a single service provider for front or back office services (not Internet Service Provider services), such Members must maintain such taxpayer security and privacy from others who share these service providers.

4.4    <u>Functionality of Member's Website and Software Program</u>. Members and/or New Market Entrants will provide the Executive Director and the IRS with a link to the Member's and/or New Market Entrant's proposed Member's Free File Website no less than 15 business days before the Website is expected to go live. Members' Free File Websites will be functionally adequate in permitting a taxpayer to complete taxpayer's return if the return is consistent with the Member's free offer. Prior to launch, the IRS and the Executive Director will review each Member's Free File Website usability. If the IRS and/or the Executive Director determine that a Member's and/or New Entrant's Software Program is difficult to use, and has or will result in a significant and measurable reduction in the ability of taxpayers to complete their return, the Member will not be listed on the IRS Free File Website or may be delisted until both the IRS and the Executive Director are satisfied that the issue(s) which led to the concern regarding Members' and/or New Market Entrants' Free File Website usability have been addressed.

4.5    <u>Disclosure of Forms and Schedules and Limitations</u>.

4.5.1   Each Member will offer all of the same federal forms and schedules as offered in their basic commercial online consumer programs if they are outside of the minimum required core forms and schedules.

4.5.2   Each Member will offer as a minimum the Core Forms and Schedules as shown in Attachment 1. IRS reserves the right to negotiate with FFI to add new forms before the start of the filing season as necessitated by new legislation.

4.5.3   Each Member and/or New Market Entrant will disclose any limitations in the forms and schedules that are likely to be needed to support Members and/or New Market Entrant's free offerings. This disclosure shall take place on Members' and/or New Market Entrants' Free File Landing Pages (or such page must have a clear link to such disclosures directly from this page). Representative examples of limitations required to be disclosed include, but are not limited to, the inability to support more than one W-2 Form, and/or the lack of a form necessary to prepare a return that is likely to be based on the offer. Limitations in forms and schedules do not include any form that is not routinely required, e.g., the separate forms required for taxpayers with foreign income, unless a Member's offering is particularly orientated around such forms.

4.5.4   Each Member will clearly disclose the supported schedules and forms in addition to the required core forms supported on the Members' Free File Landing Pages or through links on such page.

4.6   Security.

4.6.1   Members will comply with the IRS e-file Security and Privacy Standards, http://www.irs.gov/uac/IRS-e-file-Security-Privacy-and-Business-Standards-Mandated-as-of-January-1-2010

4.6.2   Members will provide no later than December 15th, each year to the IRS the following information:

   (i)   The identity of the company's Approved Payment Card Industry (PCI) scanning vendor, https://www.pcisecuritystandards.org/approved_companies_providers/approved_scanning_vendors.php .

   (ii)   An Executive Summary of the Member's PCI Vulnerability Security Scan. The summary shall include the name of the certified PCI scanning vendor, the date the scan conducted, how many live hosts were scanned, and a discussion of the findings. Vulnerability severity levels should be used to categorize the vulnerabilities (i.e., critical problem or high risk, areas of concern, or medium risk or low risk but potential problems).

4.6.3   Members will possess and provide appropriate documentation to the IRS and the Executive Director demonstrating they have acquired third party security and privacy certifications.

4.6.4   Annually before filing season launch, FFI, or its Members, will conduct penetration and vulnerability assessment of individual Members prior to the start of the filing season. The annual assessments will be conducted prior to, or concurrent with, the annual Acceptance Testing System (ATS) testing. Services relating to this assessment must be obtained from a list of approved vendors jointly created by the IRS and FFI

4.6.5   If a Member is not listed, or is delisted by agreement of the IRS and Executive Director due to perceived security or privacy vulnerabilities, the IRS and FFI have the independent authority to require a penetration test be conducted by an approved third party vendor chosen by the Member if the Member is delisted for concerns which include, but are not limited to, such penetration.

4.6.6   Only the Executive Director, the IRS, and affected individual company will be apprised of a Member's deficiencies identified as a result of any assessment by the IRS or Free File Inc.

4.6.7   Implementation of Completely Automated Turning Test to Tell Computers and Humans Apart (CAPTCHA). Members must implement a CAPTCHA program on the Member's Free File Website as a condition for participation in the program. The CAPTCHA images of text should be distorted randomly and users must then manually enter the text identically as it appears on the screen. The CAPTCHA must be implemented such that a user must successfully complete the CAPTCHA test for proceeding to the next screen. For additional information on the CAPTCHA program, Members may refer to Carnegie Mellon University's CAPTCHA resource page:  http://www.captcha.net

4.6.8   Each Member will ensure that visually impaired taxpayers may access and complete the CAPTCHA program.

4.7   <u>Hacker Attacks and Attempts at Intrusion on Member Websites</u>.

4.7.1   Any Member that learns of an inappropriate disclosure of a taxpayer's return information to an unauthorized Person, in the course Member's provision of Services, must immediately:

(i)   Report as soon as possible the unauthorized disclosure to the Executive Director and the IRS but not later than the next business day after confirmation of the incident. Members shall follow the Instructions on IRS.gov for submitting incident reports, http://www.irs.gov/Tax-Professionals/e-File-Providers-&-Partners/Instructions-for--Reporting-Web-site-Security-Incidents-(updated-10-02-08).

(ii)   Shut down Member's Free File Website at the time of detection.

4.7.2   The Executive Director and/or the IRS have complete emergency authority to shut down and/or remove the link to any Member's Free File Website if the Executive Director and/or the IRS believe, based upon objective information, that

11

unauthorized disclosure of taxpayer information has occurred and/or a threat of disclosure of taxpayer return information exists. Objective information includes, but is not limited to, copies of screens containing unauthorized taxpayer information. Objective information is not merely a complaint or allegation by a taxpayer or third party that an unauthorized disclosure has taken place. However, such a complaint or allegation, when supported by additional facts, can become the necessary objective information.  Once a Member's Free File Website has been voluntarily or involuntarily shut down, the Executive Director, the IRS and the Member will conduct a prompt review to ensure that the decision to shut down a Member's Free File Website was well founded. Such a review should be completed by the second business day after a Member is delisted. Inability to substantively complete the review based on a failure by the Member to cooperate shall extend this review. A Member's Free File Website may be relisted once the issues which caused concerns are remedied, but the Executive Director and/or IRS may request or require a broader evaluation of a Member's Free File Website before any relisting is permitted.

4.8     One Time No Cost Refiling of Taxpayer Return. When the IRS has rejected a taxpayer's return, Members will permit the IRS rejected return to be refiled at least one time without cost to the taxpayer regardless of whether the IRS rejected the taxpayer's return solely as a result of the taxpayer's mistake, e.g., the taxpayer's entry of an incorrect SSN causes the IRS rejection of the taxpayer's return.

4.9     Self-Select Personal Identification Numbers (PINs). Members must permit self-select PINs as an option for taxpayers who qualify for electronic filing of free services.

4.10    Time Out Feature. All Members must include a feature in their tax preparation software that will "time out" the session after no changes are made for a period of time consistent with best practices approved by privacy seal certification program.

4.11    Guarantee of Calculations.

    4.11.1 Each Member shall guarantee the accuracy of calculations performed by its federal free file offering. State returns are not included in this guarantee. For the purposes of this section, the term "Calculations" is defined to mean the numerical addition, subtraction, or multiplication of numbers, and related automatic features that select numbers from tax tables. Calculations do not include any instance where a taxpayer can make a decision to substitute a number for the one automatically computed by the program, and Members are not responsible for changes in tax law made by the Congress during the tax season. All Members will pay any IRS penalties and/or interest resulting from an error in the Member's Software Program's Calculations, notwithstanding the lack of revenue from FFI Filers. The amount of this guarantee shall be limited to the amount accrued when the IRS provides notice to the taxpayer of an improper calculation.

4.12    Section 7216 Compliance. Members shall only use or disclose the tax return data Members collect in provision of Services to taxpayers in accordance with the provisions of Section 7216 of the Code.

   4.12.1  Members will validate that the servers and transmission of tax return data are located in the U.S. If the servers or transmitter are located outside the U.S. or any territory or possession of the U.S., the taxpayer must agree and sign a form consenting to the disclosure. Refer to Revenue Procedure 2008-35, section 4.04(1)(e) and to Treasury Regulation §301.7216-3(a)(3) for complete information and for specific language.

4.13    Use of SSN. Whenever taxpayers are requested or required to provide their SSN, it must be part of a secure session.

4.14    Returning Free File Tax Filers.  If a taxpayer used and completed his/her return with a Member's Free File products or services in the immediately preceding tax year, and in the subsequent tax year visits the Member's commercial website(s) for tax preparation and logs into an account registered with the Member, the taxpayer must be given a first option to return to the Member's Free File offer before receiving any other alternative choices for the Member's publicly available commercial tax preparation products or services.  FFI, in consultation with the IRS, shall prescribe the requirements of this uniform communication to the taxpayer, including but not limited to the text, format and prominence of the messaging.  Manipulation of the font size and other graphical elements in order to give prominence to the secondary non-Free File option is prohibited.

4.15    Disclosure of Taxpayer Service Options.

   4.15.1  Members must permit a taxpayer who qualifies for a free return to print their return for free on their personal computer system for both e-filed and paper filed returns. This capacity must be provided for the same period of time (e.g., 3 days, 3 weeks, or 3 months) that such services are provided for free to commercial customers.

   4.15.2  Members must permit a taxpayer who does not qualify for a free return to print their return after paying the applicable fee, if any, charged to Members' commercial customers.

   4.15.3  Members must permit taxpayers who have begun to complete a tax return to complete the return during the current tax year.

   4.15.4  Members must clearly list their free customer service options.  This disclosure must be available on the Member's Free File Landing Page (or such page must have a clear and prominent link to such disclosures directly from this page).  Members must provide taxpayers a free electronic method to obtain a copy and learn the status of their electronically filed tax return.

4.16    <u>Availability of Free Services</u>. If a Member's services have not been made available on or before March 15 of any tax season, the Member will not be listed after that

date. If a Member's free services will not be available for the remainder of the tax season based on any unplanned outage, their listing will be removed. Each Member shall promptly notify FFI and the IRS of any planned or unplanned unavailability or scheduled maintenance (i.e., down time) of an offering that is anticipated to exceed 5 hours in duration. Members whose services are delisted will be restored to the IRS Free File Website consistent with IRS service capabilities, but not more than 5 business days after the IRS and the Executive Director agree the services can be relisted. IRS may display members whose Free File program remains active on IRS.gov up to the date that IRS closes processing through the MeF program.

4.17    Blackouts. Maintaining a consistent level of service is important.

  4.17.1  No planned blackouts of service are permitted from January 15 through April 15.

  4.17.2  Unplanned blackouts or scheduled maintenance in excess of 5 hours requires electronic notice of unavailability to the IRS, FFI, and, whenever possible, via Member's Free File Landing Page. Failure to provide this notice on more than one occasion is grounds for delisting.

  4.17.3  During any unplanned blackout or scheduled maintenance, customers seeking to access the Free File option should not be directed to or have access to the fee-based services of the Member.

4.18    Contact Person for Notification. Each Member, in making its offer, shall provide a contact name and number of a person(s) who may be reached 24 hours per day/7 days a week for issues regarding unavailability of the services and security breach of taxpayer data. The IRS (as well as the Executive Director) is entitled to delist any Member if contacts with such person are not successful within a 12 hour period.

4.19    Eligible Taxpayers/No Promotional Codes or Rebates/Links to Paid Sites. In providing free services to qualified taxpayers, Member programs cannot utilize promotional codes or rebates as the methodology of providing free services.

  4.19.1  Tagging of Returns. For taxpayers who enter a Member Free File Website from the IRS Free File Website and save any portion of their return, that return should be "tagged" so as to remain eligible for the Member's free offer. This paragraph does not apply to those services offered by Members in permitting extensions (4868) to be filed.

  4.19.2  Ineligibility Notification. Free File Member programs must unequivocally inform taxpayers who are ineligible for the free offer at the earliest feasible point:

    (i)     That they are ineligible for the Free File offer, and

15

(ii)    The reason that they are not eligible for the offer, and

(iii)    The taxpayer shall be directed back to the IRS Free File Landing Page as the first and most prominent alternative action so that they may immediately consider other Free File offers available from the Free File Program, and

(iv)    The disqualification practice of each Member must adhere to the standard messaging, language and formatting guidance to be provided by FFI in consultation with the IRS.

(v)    The taxpayer next may be offered a free alternative for completion of their return, provided that the taxpayer is covered by the Program limit of being among the lowest 70 percent of taxpayers.

(vi)    The taxpayer would next be offered the option to continue on the Free File Member's site and pay a fee – which is fully disclosed – to file their federal and/or state return.

4.19.3  Links to Paid Site. Providing an automatic link from the IRS Free File Website to a Member's paid website will result in delisting.

4.19.4  Solicitation for Payment. Members shall not post a billing screen requesting or collecting bank/financial information (e.g., debit/credit card information) from customers who qualify for a free return where no state tax return products have been purchased.

4.20    Date Changes. The IRS has the authority to change any date utilized in this MOU to conform to changes made in regulatory or statutory requirements, or to update the MOU each calendar year. Notice of such change will be tied to such specific regulatory or statutory requirements.

4.21    Disclosure of State Preparation and Filing Options. FFI shall offer free state tax preparation and e-filing in all states that participate in a State Free File Program. FFI is not required to provide free services for state returns in Non-Free File States. The IRS will not provide links to any Non-Free File State Department of Revenue websites from the IRS.gov Free File Website.

4.21.1  FFI members must disclose their state service offerings on each individual Member's Free File Landing Page and make clear whether such returns are free or paid. Any offer for paid state return preparation and e-filing services shall state clearly all the details of the offer, including a single, consolidated fee for such service. Free or paid state offers shall be displayed on the Free File Landing Page prominently. Members must provide the list of states that they currently support. This list shall only include states that have completed state testing and whose software programs have been approved by the state and are ready for use. Members shall include a listing of each State Free File Program that the Member participates in and a hyperlink that will allow taxpayers to access the Members' Department of Revenue State Free File offering.

4.21.2  The IRS may provide information for taxpayers on the IRS Free File Website.

Such information may include, but is not limited to, the following:

(i)     Federal Free File supports preparation of Federal tax returns. Many
        member companies also offer free or paid state tax preparation and e-filing
        services.

(ii)    Some companies may not offer state tax preparation and e-file services for all states.

The IRS further agrees it will not provide links to the Websites of any Non-Free File States Department of Revenue Websites from the IRS.gov Free File website

4.22    <u>Unilateral Changes by U.S. Government</u>. Any unilateral changes imposed by the U.S. government on FFI whether by statute, regulation, or administrative action will result in an immediate re-evaluation of the decision to continue FFI, and could result in an immediate suspension of free services upon the decision of each Member. Any inclusion of links from the IRS Free File Website to Non-Free File State Department of Revenue websites is grounds for FFI to immediately dissolve its obligations in this MOU.

4.23    <u>Compliance with Federal, State, and Local Laws</u>. Each Member shall provide all Services in accordance with all applicable federal, state, and local laws, rules, and regulations. Each Member shall immediately notify the Executive Director upon its receipt of any notification, oral or written, alleging that such Member is not providing the Services as set forth herein.

4.24    <u>No Transfer or Assignment of Membership Permitted</u>. No Member may transfer its membership interest in FFI to any Person, unless as a result of a merger or acquisition to a successor corporation to the Member reported in a timely fashion to FFI

4.25    <u>Free File Indicator</u>. Members will provide an electronic Free File indicator. If the Member is providing a Spanish version of their Free File product they will provide a Spanish Free File indicator.

4.25.1  The IRS agrees it will not use the indicator to build a marketing database;

4.25.2  The IRS agrees it will not use the indicator to compile company specific data or proprietary data; and

4.25.3  The IRS agrees it will only use the database to create aggregate data profiles of all users.

4.26    <u>Disclosure</u>. The IRS will ensure its Freedom of Information Act office is aware of FFI concerns about disclosure of company specific data, and actively afford notice and opportunity to intervene by FFI and impacted company as is required by statute and regulation.

4.26.1  The IRS will promptly notify the Executive Director in writing if a governmental agency or entity, including, but not limited to the Congress, any Inspector General, or Taxpayer Advocate, or a private party is requesting aggregate data concerning individual Members; and the IRS has concluded it cannot refuse to provide such data:

(i)    The Executive Director upon receipt of the IRS's written notification may immediately advise Members that they can cease providing the indicator;

(ii)   FFI cannot unilaterally suspend the indicator absent proof which it supplies the IRS that the aggregate data concerning an individual Member described above has been compiled or released;

(iii)  In the event any domestic law enforcement agency formally subpoenas or provides the IRS with appropriate process for data resulting from the indicator that is not aggregated, notification to the Executive Director can be delayed for a period not to exceed 90 days; and

(iv)   Any Member(s) which suspends the indicator in accordance with the terms described above shall be expected to provide the total number of accepted e-filed tax returns originating from their Free File service under procedures mutually agreed to by the IRS and the Executive Director.

4.27   <u>Pop-ups, Spyware and other Marketing Tools</u>. The IRS will work with FFI to develop further agreed upon guidance for Members to ensure that their web sites/Free File pages are in compliance with IRC §7216 with respect to pop-ups, pop-unders, adware, spyware, etc.

4.28   <u>Customer Satisfaction Survey</u>. The Members will provide the necessary support to accomplish a customer satisfaction survey.

4.29   <u>Annual Review</u>. For any multi-year agreement between the IRS and the FFI on an annual basis, the parties will review the Free File Program and decide what, if any, improvements need to be made for the next filing season. Any improvements agree to by the parties shall be reflected in an MOU executed by the parties.

   4.29.1   Review for Compliance.  FFI and IRS conduct reviews of Members' Free File Landing Pages for compliance with the requirements and obligations contained in this MOU.  The review process is under the control of the Executive Director and IRS leadership but will consist of a pre-filing season review for compliance that allows a Member to remediate any identified deficiencies, and a review to ensure that remediation has occurred.  The IRS also conducts a random, unannounced review during the filing season to ensure continued compliance.

4.30   <u>Annual Revision</u>. The IRS and the Executive Director may annually revise the MOU between the parties that provides structure for the roles.

4.31   <u>Modifications to Standards of Practice</u>. The Executive Director and the IRS may unilaterally propose additional standards necessary for the Standards of Practice during the tax season.  Any additional standards shall be provided to the Members by email. The Executive Director and/or the IRS shall determine whether the standards need to become effective immediately or can await a Member meeting. In any instance where the Executive Director and/or the IRS believe the standards need to be immediately effective, the immediacy of the effect of the new standard shall be noted in the email transmittal, and the additional standards will become effective 5

19

days later, or the first business day if the fifth day falls on a weekend or holiday.

4.32   <u>Permitted Sales, Limits on Ancillary Sales, and Selling Activity</u>

    4.32.1   Sale of State Tax Returns Permitted But Not Required. Taxpayers who enter a Member's Free File Landing Page must be able to see a clearly-stated offer for state tax return preparation and e-filing. The free or paid state return offer must be

clear and located on the top half of the landing page, and if different fonts are used, the fees and description of the state tax preparation and e-filing must be presented with a typeface and prominence no less than the majority of text on the page, and must include a single, consolidated fee charged for state return preparation and e-filing, as well as a link to a list of state forms offered and federal forms and schedules offered. This offer to provide a free or paid state return may be repeated one additional time in the Member's site. Member providers of unbranded fillable form utilities may not offer a state return.

4.32.2   <u>Provision of Federal Return When Taxpayer Does Not Qualify for a Member Free File Offer Is Permitted.</u>   When a taxpayer enters a Member's Free File Landing Page and begins to complete a return but ultimately cannot qualify for the Member's free offer, the Member must provide, as a first option, a prominent hyperlink for the taxpayer to return to the IRS Free File Landing Page (consistent with Paragraph 4.19.2).   A Member also may provide free returns to those who do not qualify for the Free File offer, provided they are covered within the terms of the Program.   Finally, a Member may inform the taxpayer that he or she has the choice of preparing and filing a federal return using the Member's commercial product.   The charge for such commercial product or service shall not exceed the usual commercial price for such products or services.

4.32.3   <u>Reasonable and Customary Charges for Taxpayer Use of Credit Card or its Equivalent Are Permitted.</u>   A Member company may charge taxpayers who have a balance due reasonable and customary charges from credit card service providers or their equivalent related to payment services they provide. Refund Anticipation Loans, Refund Anticipation Checks, and other forms of payment are not permitted by this section.

4.32.4   <u>Email Communication with Free File Taxpayers.</u>   Free File Members shall communicate not less than once annually via email with their taxpayer customers who used Free File services and completed their returns through Free File in the immediately preceding tax year prior to the opening of the following tax season. The content of this email(s) shall only remind the taxpayer about the availability of the Member's Free File offer and invite them to return to the Member's Free File Landing Page.   Free File Members shall not use these communications to communicate with the taxpayer about any non-Free File commercial products or services.   No marketing, soliciting, sale or selling activity, or electronic links to such activity, will be permitted in these email(s).

4.32.5   <u>No Other Sales and Selling Activity.</u> No marketing, soliciting, sales or selling activity, or electronic links to such activity, are permitted in the Free File Program, with the exception of the following: (i) the sale of a federal return where, as noted herein, the taxpayer is determined ineligible for the Member's Free File offer and chooses to complete and file his or her return using the Member's commercial offer, or (ii) disclosures or sales (as applicable) related to free or paid state tax preparation offers as specifically provided for in this MOU.

4.32.6   <u>Prohibition on "Value-Added" Button.</u>  Members shall not include a "value-added" button (i.e., an icon, link or any functionality that provides a taxpayer with access to a Member's commercial products or services) on the Member's Free File Landing Page.

4.32.7  The Member shall have a prominent link permitting taxpayers on a Member's Free File Landing Page to easily and clearly return to the IRS.gov Free File Landing Page.

4.33  <u>Names Utilized by Member Companies</u>. Members shall possess a clear association between the company or product name posted on <u>IRS.gov</u> and the Member's company or product name. Where a company or product name has been used prior to 2007 by a Member company, the Executive Director and the IRS has the authority to accept or reject a proposed name change to company or product name, and if the Executive Director refuses to permit such change, it is subject to the Dispute Resolution Mechanism at Article 7. No change in name of company or product will be permitted once the Member submits its name to FFI and the IRS for the tax season, unless such a change is required by an adjudication regarding such name.

4.34  <u>Use of the Free File Logo</u>. The IRS and the Members agree to use the logo consistent with the terms specified in Version 1 of the Trademark and Copyright Assignment and License Agreement, December 31, 2007.

4.35  <u>Promotion of the Free File Program</u>. The IRS will make consistent, good-faith efforts to promote the Free File Program in appropriate media activities, interactions with other federal agencies, social media and social networking activities, and in its appropriate technology applications.

4.36  <u>Innovations</u>. FFI and IRS agree that specific, continuous, and ongoing efforts should be made to provide further innovations for the benefit of Free File taxpayers.

4.36.1  <u>Pre-Population of Returning Taxpayer's Prior Year Tax Information</u>. IRS and FFI share the goal that Members should be encouraged to incorporate technology that pre-populates a taxpayer's prior year return data into the current year return

whenever a Free File taxpayer uses a Member's Free File Website for any consecutive year(s).

4.36.2 <u>Pre-Population of Taxpayer Data from W-2 and 1099 to Current Year Returns</u>. IRS and FFI agree that Members should incorporate technology that permits taxpayers to upload forms, such as W-2 and 1099, in order to pre-populate individual, current-year tax returns with the data from these forms. FFI will make a good faith effort to offer Members the use of such technology for use in the Free File program, which may be patented, copyrighted, or trade secret protected. If successful in procuring such technology at no cost, FFI will offer the use of such technology for free to Members who choose to provide this service to taxpayers within the Free File program. Notwithstanding the foregoing, any member may use its own technology to provide the services described in this paragraph. IRS will investigate requirements or voluntary agreements it may reach with payroll companies to encourage them to cooperate with this pre-population.

4.36.3 IRS and FFI mutually agree to support and promote Free File as an "Innovation Lab" to test, pilot, and offer capabilities to simplify taxpayer compliance, such as data importation offered by industry as described herein, and such as IRS's Application Programming Interface (API) projects, consistent with all other terms and conditions in this MOU.

4.36.4 This agreement does not limit IRS from providing phone-based, web-based or electronic interaction between the IRS and a taxpayer (or taxpayer's representative) regarding issues in a previously filed return after such a return has been accepted by IRS. IRS will make an effort to communicate its activities in this respect to FFI and seek opportunities to work with FFI Members.

## ARTICLE 5
## TERM

This agreement [the 8th MOU] shall be complete and binding as of the date of the last signature on this document. Notwithstanding this, the 7th MOU continues in force and effect until its termination on October 30, 2018. The term of this 8th MOU is 3 years, from its effective date on October 31, 2018 to its termination date, which shall be October 31, 2021, and may only be terminated or amended according to the terms of this agreement.

The early completion of the 7th MOU is intended to enhance the Free File Program by providing additional taxpayer protections and choice.

## ARTICLE 6
## BREACH AND REMOVAL FROM THE IRS FREE FILE WEBSITE

6.1     <u>Removal from the IRS Free File Website</u>.  A Member's listing may be removed from the IRS Free File Website, or a New Market Entrant may be refused permission to list its offering upon the IRS Free File Website, based upon the occurrence of any of the following:

    6.1.1     The IRS and/or the Executive Director's determination that a New Market Entrant does not meet the Level of Service and/or Standards of Practice of this MOU;

    6.1.2     The IRS and/or the Executive Director's determination that a Member has failed to provide Services in accordance with the Standards of Practice set forth in this MOU, and the Member has not taken necessary corrective actions, if any may be taken, in the timeframe allotted by the IRS's and/or Executive Director's written notice to the Member;

    6.1.3     The IRS and/or the Executive Director's determination that a Member has failed to comply with its obligations under this MOU per Section 4.29.1, and that the Member has failed to timely remediate identified deficiencies.

    6.1.4     The IRS and/or the Executive Director's receipt of notice that a Member has undergone an event of Bankruptcy; or

    6.1.5     The IRS and/or the Executive Director's receipt of written notice from a Member that the Member does not wish to be listed on the IRS Free File Website and/or continue in FFI

6.2     <u>Determination Process</u>. The Executive Director and/or the IRS may make the determinations described in 6.1.1 through 6.1.4 above (i) in coordination with each other; (ii) upon each party's own volition with written notice to the other party; or (iii) upon the reasonable request of a Member and/or third party as determined by the IRS in coordination with the Executive Director.

## ARTICLE 7
## DISPUTES

7.1     <u>Administrative Review</u>. After a determination process pursuant to Article 6 of this MOU, a Member advised by the IRS of the denial or removal of its free offer from posting on the IRS Free File Website has the right to an administrative review. The Member may submit a detailed written explanation with supporting documentation requesting a final determination that the decision to deny or remove their offer from the IRS Free File Website should be withdrawn. Within 3 business days of receipt of the Member's written response, the IRS will reconsider and may either withdraw or affirm its action. During this administrative review process, the decision remains in effect.

7.2     <u>Administrative Remedy</u>. After a determination process pursuant to Article 6 of this MOU, any Member who has been refused the ability to list on the IRS Free File Website and/or has been removed from the IRS Free File Website by the IRS, or

mutually by the IRS and FFI, may challenge the determination to the Civilian Board of Contract Appeals (CBCA) in accordance with the CBCA's Rule of Procedure.

The CBCA's review is authorized by the Alternative Dispute Resolution laws and regulations issued by the U.S. Government and are in lieu of any litigation in any court.

7.2.1   The CBCA will be the exclusive venue for resolving disputes concerning any action taken by the IRS or the IRS and FFI under the terms of this MOU as described in 7.2.

7.2.2   FFI shall be responsible for paying the CBCA for all costs incurred by the CBCA in any proceeding related to this provision. Each party to the adjudication shall initially pay its own costs and fees. For the purposes of this section, a party to adjudication may include any Member, FFI, and/or the IRS.

7.2.3 If the IRS, or mutually by the IRS and FFI, determines not to permit a New Market Entrant to list its offering on the IRS Free File Website, the IRS and FFI, by mutual agreement, may permit or refuse the New Market Entrant the right to use this provision to review the decision not to permit the New Market Entrant's listing on the IRS Free File Website.  For the purposes of this Section, the payment provisions of Section 7.2.2 apply to any adjudication brought by a New Market Entrant.7.2.4 A Member or New Market Entrant who does not prevail in its appeal before the CBCA is required to pay 100 percent of the costs, fees, and expenses incurred by the CBCA and FFI. FFI will invoice the Member and/or New Market Entrant for such costs, fees and expenses, and the Member and/or New Market Entrant shall pay FFI within 10 days of presentation of an invoice for such amount.  If the Member or New Market Entrant does not pay these costs, they are no longer in good standing and cannot participate in FFI meetings or be posted on the IRS website.

7.3   The following rules apply to all CBCA proceedings: the Member and/or New Market Entrant who challenges an IRS determination or a joint determination of the IRS and FFI under Section 6 or 7 of this MOU shall not be entitled to any monetary remedies, and the Member's and/or New Market Entrant's sole and only remedy shall be an order directing the IRS to act in accordance with the CBCA's decision. The CBCA's decision with respect to the termination or reinstatement of the Member on the IRS Free File Website or any other order shall be final and binding and shall not be subject to review. The CBCA shall have the authority to grant motions, including motions to dismiss and motions for summary judgment, in appropriate circumstances. The CBCA shall have no authority to add to or to modify this MOU, except as permitted by joint agreement of the CBCA, IRS and FFI.

**ARTICLE 8**
**NO RELATIONSHIP TO FFI OPERATING AGREEMENT**

FFI can continue to change and amend the FFI Operating Agreement without regard to this MOU. Notwithstanding the prior sentence, the terms of the FFI Operating Agreement and/or any change in the FFI Operating Agreement have no impact on this MOU unless and until the

MOU is amended in writing by agreement between the IRS and FFI, which agreement can be withheld by the IRS.

## ARTICLE 9
## INTEGRATED AGREEMENTS

The terms of this MOU are final and binding unless and until it is superseded by a signed agreement between the parties. The IRS and FFI agree that this document and all prior original and supplemental signed agreements other than only the current and latest MOU between the IRS and FFI remain in full force and effect unless the language of this MOU is inconsistent with such prior written terms, in which case the terms and language of this MOU shall control.


## ARTICLE 10
## TERMINATION

10.1   Either party may terminate this MOU for cause if the other Party fails to comply with this MOU, and such failure is not cured within thirty days of written notice of such failure from the other party.

10.2   The IRS may terminate this MOU without cause, such termination to be effective 12 months after the date of notice of such termination.

10.3   Should the IRS commit funding to offer Services for free to taxpayers the IRS shall notify FFI immediately. If the IRS gives such notice during the tax season (between January 1 and April 15, or the last day of the filing deadline if that date is changed from April 15) of any year, FFI may, by written notice to IRS, terminate this MOU, effective on April 16 (or, if the filing deadline is changed from April 15, on the day following such new deadline) of that year. If the IRS gives such notice between April 16 (or, if the filing deadline is changed from April 15, on the day following such new deadline) and October 15 of any year, then FFI may, by written notice to IRS other than during a tax season, terminate this Agreement, such termination to be effective no fewer than 30 days after the date of FFI's notice of such termination. If IRS gives such notice between October 15 and December 31, FFI may by written notice immediately terminate this Agreement at any time on or before December 31.

Date: 10-31-18

Kenneth Corbin
Commissioner, Wage and Investment Division
Internal Revenue Service

Date: 10-25-18

Timothy Hugo
Executive Director,
Free File, Inc.

Exhibit 3

GUTRIDE SAFIER
Attorneys at Law

Stephen Raab <stephen@gutridesafier.com>

## Re: Olosoni et al. v. H&R Block

1 message

**Seth Safier** <seth@gutridesafier.com>                              Wed, Jun 26, 2019 at 10:01 AM
To: "Cottriel, Darren K." <dcottriel@jonesday.com>
Cc: hrblock <hrblock@gutridesafier.com>

Thanks, Darren.  Attached is the CLRA letter.  Also attached is the stip with minor edits.  If you have no further changes, you have my consent to file.  Cheers, Seth

On Wed, Jun 26, 2019 at 6:40 AM Cottriel, Darren K. <dcottriel@jonesday.com> wrote:

Seth,

Attached is the proposed stipulation for the extension of time to respond and sequencing.  Please let me know if the language is acceptable and if we are authorized to file with the court.

Also, this confirms that our clients have authorized my office to accept service of the CLRA letter on their behalf and to waive the Section 1782(a) certified mail notice requirement.  It is fine if you want to email them to me (no need to snail mail).  In making this agreement, Defendants do not agree that notice is timely or that any defendant has a place of business in California.  Thanks.

Regards,

Darren

Darren K. Cottriel
Partner
JONES DAY® - One Firm Worldwide℠
3161 Michelson Drive, Suite 800
Irvine, California 92612-4408
Office +1.949.553.7548
dcottriel@jonesday.com

**From:** Seth Safier <seth@gutridesafier.com>
**Sent:** Tuesday, June 25, 2019 12:19 PM
**To:** Cottriel, Darren K. <dcottriel@jonesday.com>
**Cc:** hrblock <hrblock@gutridesafier.com>
**Subject:** Re: Olosoni et al. v. H&R Block

TY

On Tue, Jun 25, 2019 at 12:17 PM Cottriel, Darren K. <dcottriel@jonesday.com> wrote:

> Thanks, Seth. Let me check with our client and confirm we can accept direct for them.
>
> Sent with BlackBerry Work
> (www.blackberry.com)
>
> _____
>
> **From:** Seth Safier <seth@gutridesafier.com>
>
> **Date:** Tuesday, Jun 25, 2019, 7:25 PM
>
> **To:** Cottriel, Darren K. <dcottriel@jonesday.com>
>
> **Cc:** hrblock <hrblock@gutridesafier.com>
>
> **Subject:** Re: Olosoni et al. v. H&R Block
>
> Darren,
>
> One additional house keeping matter.  We have been holding off on serving your clients with a CLRA letter.  Please let us know if you want us to serve them directly (even though represented) or whether you will accept service on their behalf and waive the section 1782(a) notice requirement --i.e., that the CLRA letter be "sent by certified or registered mail, return receipt requested, to the place where the transaction occurred or to the person's principal place of business within California."  Thanks, Seth
>
> On Mon, Jun 24, 2019 at 4:20 PM Cottriel, Darren K. <dcottriel@jonesday.com> wrote:
>
>> Thanks, Seth.  The 21 day extension works fine.  We'll prepare a stipulation on the extension and sequence, and send to you for review.  I will need to discuss the interim lead counsel motion with our client, and it would help if you can send me the motion first.  Thank you.
>>
>> Regards,
>>
>> Darren
>>
>> Darren K. Cottriel
>> Partner
>> JONES DAY® - One Firm Worldwide℠
>> 3161 Michelson Drive, Suite 800
>> Irvine, California 92612-4408
>> Office +1.949.553.7548
>> dcottriel@jonesday.com

**From:** Seth Safier <seth@gutridesafier.com>
**Sent:** Monday, June 24, 2019 4:14 PM
**To:** Cottriel, Darren K. <dcottriel@jonesday.com>
**Cc:** hrblock <hrblock@gutridesafier.com>
**Subject:** Re: Olosoni et al. v. H&R Block

Thanks, Darren. Yes re (1) and how about 21 days on (2)?  We will likely file a motion to be appointed interim lead counsel, please let us know if Defendants will oppose. (If you want to see it first, no problem.)  Safe travels!!

On Mon, Jun 24, 2019 at 4:11 PM Cottriel, Darren K. <dcottriel@jonesday.com> wrote:

> Seth,
>
> It was nice meeting you via phone today to discuss the case.  Below is my contact information.  As discussed, please let me know if: (1) you are agreeable to sequencing things so the motion to compel arbitration issues are briefed and decided first before motions on merits / 12(b)(6) issues are briefed and decided, and (2) you will agree to a 30 day extension of time for H&R Block to file the motion to compel arbitration.  Thank you.
>
> Regards,
>
> Darren
>
> Darren K. Cottriel
> Partner
> JONES DAY® - One Firm Worldwide℠
> 3161 Michelson Drive, Suite 800
> Irvine, California 92612-4408
> Office +1.949.553.7548
> dcottriel@jonesday.com
>
> ***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

--

Seth Safier
Gutride Safier LLP
100 Pine Street, Suite 1250

San Francisco, CA 94111
Telephone: (415) 336-6545
Facsimile: (415) 449-6469
www.gutridesafier.com

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

--

Seth Safier
Gutride Safier LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 336-6545
Facsimile: (415) 449-6469
www.gutridesafier.com

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

--

Seth Safier
Gutride Safier LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 336-6545
Facsimile: (415) 449-6469
www.gutridesafier.com

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

--
Seth Safier
Gutride Safier LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 336-6545
Facsimile: (415) 449-6469
www.gutridesafier.com

--
You received this message because you are subscribed to the Google Groups "hrblock" group.
To unsubscribe from this group and stop receiving emails from it, send an email to hrblock+unsubscribe@gutridesafier.com.

To view this discussion on the web visit https://groups.google.com/a/gutridesafier.com/d/msgid/hrblock/
CADAcFQCVMpSAF61RwKchOTSFTVYQ7iuPHKowXw6Q%3DrUEL3HjKQ%40mail.gmail.com.

**2 attachments**

 **H&R Block Stipulation v2 MAM.docx**
50K

 **HR BLOCK SIGNED CLRA LETTER 06262019.pdf**
5053K

GUTRIDE SAFIER LLP                                    Attorneys at Law

**VIA CERTIFIED MAIL;**                        June 26, 2019
**RETURN RECEIPT REQUESTED**

H & R Block, Inc.
One H&R Block Way
Kansas City, MO 64105

H & R Block, Inc.
c/o C T Corporation System
120 S. Central Avenue, Ste. 400
Clayton, MO 63105

H & R Block, Inc.
c/o H&R Block Enterprises
7604 Pacific Ave., 2nd Floor
Stockton, CA 64105

H&R Block Enterprises
7604 Pacific Ave., 2nd Floor
Stockton, CA 64105

H&R Block Enterprises
c/o C T Corporation System
818 W. 7th St. #930
Los Angeles, CA 90017

HRB Tax Group, Inc.
c/o C T Corporation System
120 S. Central Avenue, Ste. 400
Clayton, MO 63105

HRB Tax Group, Inc.
c/o H&R Block Enterprises
7604 Pacific Ave., 2nd Floor
Stockton, CA 64105

HRB Digital LLC
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange St.
Wilmington, DE 19801

HRB Digital LLC
c/o H&R Block Enterprises
7604 Pacific Ave., 2<sup>nd</sup> Floor .
Stockton, CA 64105

    **Re:**    **Ongoing violations of the California Consumers Legal Remedies Act**

Dear Sirs:

I write on behalf of my clients, Pelanatita Olosoni and Derek Snarr, and the class of similarly situated persons they seek to represent, to advise you that H & R Block, Inc.; HRB Tax Group, Inc.; HRB Digital LLC; its parents, franchisees, operating entities and subsidiaries (collectively "H&R Block") have violated, and continue to violate, California's Consumers Legal Remedies Act ("CLRA"), California Civil Code §§1750 *et seq.*; False Advertising Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*; Unfair Competition Law, Cal. Bus & Prof. Code §§ 17500 *et seq.* in connection with the marketing and sale of its H&R Block brand of tax preparation software. I ask that H&R Block remedy these violations within thirty (30) days.

## A. H&R Block's Free File Program

In 2002, the Internal Revenue Service ("IRS") launched a program pursuant to which the majority of taxpayers in the United States would be able, and would be encouraged, to e-file their federal tax returns for free (referred to herein as "Free File"). To accomplish this goal, the IRS partnered with private companies to handle the e-filing services and processes. Under the program, all taxpayers with adjusted gross income below the 70<sup>th</sup> percentile (currently, below $66,000 per year) are eligible for free online filing.

Through its participation in the IRS Free File program, H&R Block is required to make available free electronic tax filing services to certain eligible taxpayers and to refrain from marketing its commercial services in competition with the Free File program. While H&R Block does purport to offer such a free service (referred to herein as "True Free File Service"), H&R Block affirmatively hides that program from taxpayers seeking free e-filing services and diverts them to its competing paid programs, which it represents as "free," "free tax filing," and "H&R Block's free online tax filing" (referred to herein as "Fake 'Free' Offer").

H&R Block's use of the Fake "Free" Offer to divert taxpayers from the IRS Free File program and to prompt taxpayers to "upgrade" and pay for H&R Block's tax preparation services is essentially a bait-and-switch scheme ("Bait-and-Switch Program"). Once H&R Block lures taxpayers into its Bait-and-Switch Program, it falsely and misleadingly tells them that they must pay to file their tax returns, even though the taxpayers are actually eligible to file their returns for free through H&R Block's True Free File Service or through another IRS Free File program offered through another provider.

For those few taxpayers who actually make it to the landing page for H&R Block's True Free File Service, those over the age of 51 will find that they are generally ineligible for H&R Block's version of the program, even though they are eligible for free filing under multiple other free services within the IRS Free File program. But H&R Block does not inform such taxpayers that there are other free filing offers or that the IRS Free File program is much broader than H&R Block's True Free File Service.

H&R Block's deceptive conduct of creating the Bait-and-Switch program and exclusion of eligible taxpayers from its True Free File Service misleads reasonable taxpayers to believe that they are ineligible for the IRS Free File program, when in fact they are eligible. These actions violate both California law and H&R Block's agreement with the IRS.

## B. Ms. Olosoni's Experience

Ms. Olosoni has been using H&R Block's online products to file her taxes since about 2015. H&R Block charged her fees in every year that she filed through them. Throughout this period, Ms. Olosoni saw television advertisements, heard radio advertisements, and viewed representations on H&R Block's website that taxpayers could file tax returns for "free" through H&R Block. At one point, Ms. Olosoni called H&R Block to determine why she had been charged despite its representations that tax filing would be "free" and despite her belief that she was entitled to file her returns for free. That inquiry was never substantively answered.

In or about January 2019, Ms. Olosoni directly logged in to H&R Block account. When she logged in to her account, H&R Block routed Ms. Olosoni to their Bait and Switch Program rather than its True Free File Service. Ms. Olosoni believed she was eligible to file for free under generally available programs (such as the IRS Free File program). Further, based on H&R Block's representations in their television and radio advertisements and the representations on H&R Block's webpages within their Bait-and-Switch Program, Ms. Olosoni believed she qualified for a free tax return and that she could file a free tax return through H&R Block's website. Ms. Olosoni spent approximately 45 minutes entering in her sensitive personal and financial information, in reliance on that belief. At the end of that process, she was informed that she was not eligible to file her tax return for free and that she would be charged fees (about $85) for her state and federal filings. She opted

to have the fees deducted from her refund, in reliance on H&R Block's representation that she did not qualify to file her tax return for free.

Ms. Olosoni's AGI for 2018 was less than $66,000, so she was an Eligible Taxpayer under the IRS Free File program, and she qualified for a free federal return e-filing under multiple offers available under the IRS Free File program. Ms. Olosoni would not have paid for H&R Block's service if she had been informed at the outset of the process that she was eligible for H&R Block's True Free File Service (as well as free tax filing from other tax service providers) and that the service to which she had been directed was not part of that True Free File Service.

## C. **Mr. Snarr's Experience**

Mr. Snarr conducted a Google search for the words "free tax filing" (or a substantially similar combination of words) on or about April 15th, 2019. H&R Block's website was one of the top results. Through that search result and its associated link, H&R Block routed Mr. Snarr to their Bait-and-Switch Program rather than its True Free File Service.

On or about April 15, 2019, Mr. Snarr spent multiple hours entering his tax information on H&R Block's website believing that he was eligible to file his tax return for free and that the tax preparation and filing service offered by H&R Block would be free. But, at the end of H&R Block's online process, Mr. Snarr was informed that he did not qualify for the Fake "Free" Offer that H&R Block had advertised and to which it had directed him, and was informed that he needed to pay fees to file his tax return with H&R Block. Mr. Snarr opted to proceed, despite the fees, in reliance on H&R Block representation that he did not qualify to file his tax return for free.

Mr. Snarr's AGI for 2018 was less than $66,000, so he was an Eligible Taxpayer under the IRS Free File program, and he qualified for a free federal return e-filing under multiple offers available under the IRS Free File program. Mr. Snarr would not have paid for H&R Block's service if he had been informed by H&R Block at the outset of the process that he was eligible for its True Free File Service and that the service to which he had been directed was not part of that True Free File Service.

## D. **Violations of the CLRA**

H&R Block's activities with respect to the marketing and sale of its H&R Block software violate §§ 1770(a)(5), 1770(a)(7), 1770(a)(8), 1770(a)(9), 1770 (a)(10), and § 1770(a)(13) of the CLRA as follows:

- representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have (i.e., H&R Block's statements and actions that lead the general public to falsely believe that H&R Block's Fake "Free" Offer is free for most taxpayers

4

and that it is the free tax filing service taxpayers are seeking, when it is neither);

- representing that the goods or services that they sell are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they were not (same);

- disparaging the goods, services or business of another by false or misleading representation of fact (same, and H&R Block's acts, statements, and practices designed to mislead taxpayers who are excluded from H&R Block's True Free File Service but who are eligible for the IRS Free File program to believe that they are ineligible for the IRS Free Filing program and/or that the IRS Free File program is also limited by the conditions, exclusions, or limitations of H&R Block's True Free File Service and/or by those of H&R Block's Fake "Free" Offer);

- advertising goods or services with intent not to sell them as advertised (same);

- advertising goods or services with intent not to supply reasonably expectable demand, unless the advertisement discloses a limitation of quantity (same); and

- making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions (same).

Ms. Olosoni and Mr. Snarr accordingly requests that H&R Block take the following actions within thirty (30) days:

- Identify (or make reasonable efforts to identify) all consumers who paid to file one or more federal tax returns through H&R Block's online, desktop, and/or mobile application versions of its tax filing system even though they were eligible for IRS Free File program;

- Notify all consumers that H&R Block will provide to them a full cash refund for the amount that they were charged;

- Give any such requested remedy to the consumers in a reasonable amount of time; and

- Immediately cease from engaging, or if immediate cessation is impossible or unreasonably expensive under the circumstances, then cease from engaging within a reasonable time, in the above-complained of methods, act, or practices.

If H&R Block fails to comply with this request within thirty (30) days, then Ms. Olosoni and Mr. Snarr reserve the right to seek (including, without limitation, by amending the complaint[1] that they recently filed in San Francisco County Superior Court) the following monetary amounts for themselves and for a nationwide or California class under the CLRA:

- Actual damages suffered;
- Punitive damages;
- Costs and attorneys' fees related to suit; and
- Penalties of up to $5,000.00 for each incident where senior citizens have suffered substantial physical, emotional or economic damage resulting from H&R Block's conduct.

## E. Conclusion

I hope that H&R Block will choose to correct these unlawful practices promptly. A failure to act within thirty (30) days will be considered to be a denial of this claim and my client will act accordingly.

Please call me at (415)-336-6545 to further discuss this matter. Otherwise, we look forward to H&R Block immediately changing its practices and compensating the above-identified individuals.

Sincerely yours,

Seth Safier, Esq.

---

[1] *Olosoni v. H&R Block, Inc.*, CGC-19-576093.